**PEOPLES NATURAL GAS COMPANY, A DIVISION OF INTER-NORTH, INC., petitioner, Relator,**

v.

**MINNESOTA PUBLIC UTILITIES COMMISSION, Respondent,**

**Erie Mining Company, Hibbing Taconite Joint Venture, and The Hanna Mining Company, intervenors, Respondents.**

No. C6–83–1684.

Supreme Court of Minnesota.

June 21, 1985.

Rehearing Denied Aug. 13, 1985.

Elmer B. Trousdale, St. Paul, Phillip Crowley, Peoples Natural Gas Co., Law Dept., Council Bluffs, Iowa, for Peoples Nat. Gas Co.

Karl Sonneman, Allen E. Giles, Asst. Atty. Gen., St. Paul, for Minnesota Public Utilities Com'n.

Robert S. Lee, Minneapolis, for Erie and Hibbing Min. Co.

Lawrence G. Acker, Washington, D.C., for Hanna Min. Co.

SIMONETT, Justice.

Does the Public Utilities Commission have implied authority to order a public utility to refund charges collected under rates that the Commission had previously declared discriminatory? We hold it does not and reverse the contrary ruling of the Court of Appeals.

Appellant Peoples Natural Gas Company (hereinafter either Peoples or the utility) sells natural gas to customers in the southeastern, east central, and northwestern parts of this state, including five large taconite producers on the Iron Range. In 1976, respondent Erie Mining Company, one of the taconite producers, complained that it was being charged a discriminatory rate under its "negotiated contract" with the utility.[1] The Commission on its own

---

1. Initially, Peoples had sold gas to the taconite producers on the basis of individually negotiated contracts. On January 1, 1975, the effective date of the Public Utilities Act of 1974, these negotiated contract rates were grandfathered in as rates to be charged under Minn.Stat. §§ 216B.05 and 216B.06 (1984). Peoples filed its contracts with the Commission "for information purposes only," and did not file subsequent contract amendments or adjustment, taking the position that the Commission lacked jurisdiction over these contracts. Eventually, as we shall see, Peoples lost this jurisdictional argument.

motion initiated an investigation and ordered a hearing pursuant to Minn.Stat. § 216B.21 (1984). Respondents Erie Mining Company and Hanna Mining Company, as well as three other taconite producers, intervened. This proceeding, informally called the Erie Complaint Case, culminated in a Commission order dated August 17, 1978, declaring that the rates charged the taconite customers were "discriminatory within and between customer classes," and further stating, "Peoples is hereby ordered to submit a rate schedule to be considered when Peoples petitions the Commission for a general rate increase which will eliminate the inequities, including all demand charges during periods of curtailment."

This order, however, was not implemented, because Peoples mounted a challenge in the courts to the Commission's jurisdiction to regulate the utility's direct sales to its large volume customers. The Commission, consequently, postponed new rates for the taconite producers and ordered that "Peoples' existing contractual rates for such service shall remain in effect until such time as the Supreme Court has concluded the Commission has jurisdiction over such sales and the Commission orders new rates into effect." In May 1980, this court held that the Commission did have jurisdiction under the Public Utilities Act to regulate Peoples' direct sales to the taconite producers. *Northern Natural Gas Co. v. Minnesota Public Service Comm'n*, 292 N.W.2d 759 (1980). Following this court decision, the Commission issued its order of July 10, 1980, in the Erie Complaint Case, the interpretation and effect of which lies at the heart of this appeal.

The Commission's decision of July 10, 1980, recites that no general rate case had yet been filed by the company and that "the concerns felt nearly two years ago continue to press the Commission." The Commission noted that it had already, in August 1978, found the Company's taconite rates discriminatory. The Commission

then ordered a general rate case proceeding, stating that a full rate case protects the utility and also "affords the Commission, the public, and other interested parties the best opportunity to examine and evaluate the structure, management, and condition of the utility in an open forum." The docket in the Erie Complaint Case was closed, and Peoples was ordered to file a general rate case on or before August 21, 1980. (Subsequently, this deadline was extended to "November 31, 1980.")[2] In the same order, the Commission concluded:

> As part of that filing [for a general rate case], Peoples shall propose a rate for its large volume direct-sale customers * * *.
>
> The Commission will not now order the rates for those large volume customers changed. * * * [T]he Commission's October 11, 1979, Order retaining Peoples' existing contractual rates will remain in effect until Peoples institutes new rates under bond pursuant to M.S. § 216B.16.

Peoples chose to read this order to require it to put into effect new uniform rates for the five taconite producers at the end of the general rate case, not at the beginning. On December 1, 1980, Peoples filed its Notice of Change in Rates, announcing that 90 days later, on March 1, 1981, it would put into effect under bond, subject to refund, its new general service rates, but also stating that there were other rate design proposals—namely, for the taconite producers—that it was not implementing on an interim basis, "because they represent a significant departure from the current rates to the affected classes." Respondents Erie, Hanna, and Hibbing Taconite Joint Venture, as well as four other taconite producers, intervened in this proceeding. There was no objection by either the Commission or any of the taconite customers to leaving the old taconite rates in effect.

By February 1982, the Commission had concluded the general rate case and it then issued its order approving new rates. In

**2.** November 31 is an obvious typographical error. Peoples chose to construe this to mean its filing was due on December 1, 1980.

this proceeding, the respondent taconite producers had petitioned for a refund of amounts overpaid by them while the general rate case was pending. The Commission first denied the refund claim but then, on reconsideration, ordered that the utility refund to Erie, Hibbing, and Hanna the difference between the original discriminatory rates and the rates approved in the general rate case for the interim period from March 1, 1981, to February 9, 1982. This refund, exclusive of interest, came to $829,917.77.

Peoples appealed the refund order dated August 23, 1983, to the Court of Appeals, arguing that the Commission lacked statutory authority to make the order. The Court of Appeals held that the Commission had implied authority to order refunds and affirmed the Commission's action. *Peoples Natural Gas Co. v. Minnesota Public Utilities Comm'n*, 348 N.W.2d 347 (Minn. App.1984). We granted the utility's petition for further review.

### I.

A preliminary issue is whether the utility violated the Commission's order of July 10, 1980, by not putting its proposed uniform rates for taconite customers into effect for the interim period beginning March 1, 1981.

■ The significance of this issue is that if the new taconite rates were to have gone into effect on March 1, 1981, then the subsequent order to the utility to refund "overcharges" for the period March 1, 1981, to February 9, 1982, cannot be characterized as retroactive ratemaking, which is prohibited. Ratemaking is a quasi-legislative function, *see St. Paul Chamber of Commerce v. Minnesota Public Service Comm'n*, 312 Minn. 250, 262, 251 N.W.2d 350, 358 (1977), and legislation operates prospectively. Indeed, the Public Utility Act expressly prohibits retroactive ratemaking. Minn.Stat. § 216B.23, subd. 1 (1984), provides: "[T]he commission shall * * * by order fix reasonable rates * * * *to be imposed, observed and followed in the future.*" (Emphasis added.) *See also* Minn.Stat. § 216B.16, subd. 5 (1980) ("If, after the hearing, the Commission finds the

rates to be unjust or unreasonable or discriminatory, the commission shall determine the level of rates to be charged or applied by the utility * * * and the rates are thereafter to be observed * * *."), and the present version of that statute, as amended by 1982 Minn.Laws, ch. 414, § 5, ("Rate design changes shall be prospective * * *.").

Respondents argue that the Commission in 1978 had found the utility's taconite rates unlawful; that the Commission's order of July 10, 1980, operated prospectively because the utility was required to implement new nondiscriminatory rates for its taconite customers only from and after March 1, 1981; and that the utility failed to comply with the Commission's order. Therefore, say respondents, the refund order is not enacting a new rate retroactively but is only requiring restitution of charges which the utility knew it should not have collected. The utility, on the other hand, argues that the July 10, 1980, order did not require new taconite rates to be put into effect for the interim period, and, therefore, to now collect these charges under the guise of a refund would be forbidden retroactive ratemaking.

The Commission's order provided that "Peoples' existing contractual rates will remain in effect until Peoples institutes new rates under bond * * *." The Commission first construed this order to mean that Peoples was free to elect whether to institute new taconite rates under bond for the interim period or to leave its old contractual rates in effect, and that for the Commission to order a refund under these circumstances would constitute retroactive ratemaking. Subsequently, the Commission reversed itself and ruled that Peoples' interpretation of the July 10 order was "disingenuous," that retroactive ratemaking was not involved, and that Peoples must refund the "overcharges of illegal, discriminatory rates."

■ When the July 10 order is read as a whole and in the context of the series of orders preceding it in the Erie Complaint

Case, we think it clearly required the utility to put its new taconite rates into effect under bond for the interim period. We affirm the Commission's ruling that the utility violated the July 10 order by not placing its proposed uniform taconite rates into effect for the interim period.

## II.

■ We may now frame the main legal issue in this case: Does the Commission have statutory authority, express or implied, to require a public utility to refund revenues collected from its customers in violation of a commission order? We conclude it does not.

First of all, as the respondent Commission itself concedes, there is no express statutory authority for the Commission to order refunds of past revenue collections.[3] The precise issue is whether such authority is implied. Respondents cite repeated statements in the Public Utilities Act that the Commission's responsibility is to assure rates that are just and reasonable. *See* Minn.Stat. § 216B.03 (1984) ("Every rate made, demanded, or received * * * shall be just and reasonable. Rates shall not be unreasonably preferential, unreasonably prejudicial or discriminatory * * *."); and section 216B.07 (prohibits "any unreasonable preference or advantage" or "any unreasonable prejudice or disadvantage"). Under section 216B.08, the Commission is vested with the "powers, rights, functions, and jurisdiction to regulate" in accordance with the provisions of the Public Utilities Act. From this statutory scheme, respondents claim that authority to order refunds can be implied. If the Commission has a duty to see that reasonable rates are charged, then, says the Commission, "it must have implied authority to refund in

order to effectively correct overcharges or other unreasonable rates." This argument is not unattractive.

■ On the other hand, "[i]t is elementary that the Commission, being a creature of statute, has only those powers given to it by the legislature." *Great Northern Railway Co. v. Public Service Comm'n,* 284 Minn. 217, 220, 169 N.W.2d 732, 735 (1969). The legislature states what the agency is to do and how it is to do it. While express statutory authority need not be given a cramped reading, any enlargement of express powers by implication must be fairly drawn and fairly evident from the agency objectives and powers expressly given by the legislature. "Neither agencies nor courts may under the guise of statutory interpretation enlarge the agency's powers beyond that which was contemplated by the legislative body." *Waller v. Powers Department Store,* 343 N.W.2d 655, 657 (Minn.1984). The question here is whether the legislature intended, without saying so, to confer a refund power on the Commission. We have no ambiguous language to construe, unless perhaps the ambiguity of silence. Consequently, we must look at the necessity and logic of the situation.

It is of some significance that the legislature has not seen fit expressly to grant refund powers to the Commission, although it could have done so and in one instance has at least recognized its use. *See supra* note 3. It seems significant, too, that under section 216B.23, when the Commission, after an investigation, finds that rates and charges are unreasonable, discriminatory, or unlawful, the express authority given the Commission is only to fix reasonable rates and charges "to be imposed, observed and followed *in the future* in lieu of those

---

**3.** At the times here material, Minn.Stat. § 216B.16, subd. 3 (1980), expressly provided for refunds by a utility where the utility had, during an interim period, chosen to put its suspended rates into effect under bond. Under this procedure, the utility would agree, as a condition of its bond, to refund excess rates collected. Indeed, this was the procedure that Peoples followed for its general service customers. The statute was amended in 1982 authoriz-

ing the Commission to order interim rate schedules into effect and further authorizing the Commission to order a refund of excess sums collected. 1982 Minn.Laws, ch. 414, § 4 (codified at Minn.Stat. § 216B.16, subd. 3 (1982)). Interestingly, since its enactment, the statute has provided that if the refunds are not paid, the Commission may sue and recover on behalf of those entitled to a refund.

found to be unreasonable or unlawful." (Emphasis added.)

We agree, however, that in the situation before us, the refund order does not involve retroactive ratemaking. The issue, rather, is an agency's power to enforce its own orders. In this context, the Commission points out that it is authorized by statute to act in a quasi-judicial capacity. Minn.Stat. §§ 216A.02, subd. 4, and 216A.05, subd. 1 (1984). Some jurisdictions have recognized refund powers in their state public service commissions, and respondents cite, for instance, *Northern Michigan Water Co. v. Michigan Public Service Comm'n*, 381 Mich. 340, 161 N.W.2d 584 (1968). Such cases, however, do not particularly help us here because the statutory schemes are different. The utility, on the other hand, argues that there is no necessity to imply a refund remedy because the Commission has other means to enforce its orders. It is, for example, empowered to assess penalties for violation of orders, Minn.Stat. §§ 216B.57–.61 (1984), or it may refer matters to the Attorney General for appropriate legal action, Minn. Stat. § 216B.54 (1984). The Commission counters by contending that these enforcement powers are inadequate to deal with the utility's violation. Finally, Peoples cites *T.I.M.E., Inc. v. United States*, 359 U.S. 464, 468–72, 79 S.Ct. 904, 907–09, 3 L.Ed.2d 952 (1959), where the Supreme Court declined to imply that a private cause of action to recover unreasonable rates was authorized under the Motor Carrier Act. That case, while not in point, does demonstrate the reluctance of courts to expand by implication upon express legislative grants of authority to administrative agencies.

This much is clear. Public regulation of utility rates is an intricate, ongoing process. A reallocation of rates may set in motion an ever-widening set of consequences and adjustments, and a refund not under bond may further complicate these consequences. Take this case for example. In 1978, the Commission found that Peoples' contract rates were discriminatory "within and between customer classes" but left the overall amount of revenue that Peoples was entitled to raise by its rates undisturbed. The utility's problem was to reallocate its rates to meet its revenue requirements. To the extent that this reallocation would take place only within the taconite producer class, it meant that the rates for three of the producers would be lowered while the rates for others would be raised. It was also possible that rates of the three respondent producers might be left the same and the rates of other producers raised. This latter possibility perhaps may be why Erie, Hibbing, and Hanna did not object when the utility gave notice that it was not implementing new interim taconite rates under bond. In addition, in its filing of a general rate case, the utility was interested in increasing its overall revenue requirements and in designing a new rate schedule for all customer classes to meet those new requirements. Into this regulatory process, the Commission has now injected an order requiring the utility to refund to Erie, Hibbing, and Hanna approximately $830,000 plus interest. The result, says the utility, is that it will have collected less than the revenue requirements found just and reasonable by the Commission. Peoples says the refund amounts to over half of its total 1981 after-tax net income in Minnesota. Apparently in recognition of this claim, the Commission has now initiated a new proceeding to determine if Peoples sustained a revenue deficiency as a result of the refund, and, if so, if Peoples is entitled to recover it and from whom.

It seems to us that the power to order refunds would introduce a new factor of considerable consequence into the regulatory equation. The refund power, concededly, has not been expressly given, and we conclude that this is not the kind of agency authority that can or should be implied in the absence of more explicit legislative action. It is not enough that the power to order refunds would be useful to the Commission as an enforcement measure. The Commission remains a creature of statute. It presides over an ongoing, intricate regulatory process with duties

prescribed by the legislature in considerable detail and where the legislature has generally required the agency to act prospectively. We hold, therefore, that the Public Utilities Commission does not have the power or authority to order Peoples to refund the past revenue collections at issue here.

The decision of the Court of Appeals affirming the Commission's refund order is reversed. The Commission's refund order is also reversed.

Reversed.