In the Matter of the Petition of NORTH-ERN STATES POWER COMPANY for Authority to Change its Schedule of Gas Rates for Retail Customers within the State of Minnesota.

In the Matter of the Proposal of NORTH-ERN STATES POWER COMPANY for Recovery of Gas Conservation Expenditures.

NORTHERN STATES POWER
COMPANY, Relator,

v.

MINNESOTA PUBLIC UTILITIES COM-MISSION, et al., City of St. Paul, Minnesota Department of Public Service, Minnesota Public Interest Research Group, Respondents.

No. C1-86-487.

Supreme Court of Minnesota.

Oct. 23, 1987.

Samuel C. Hanson, John P. Van de North, Jr., Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Karl W. Sonneman, Sp. Asst., St. Paul, for MPUC.

George Deretich, St. Paul, for City of St. Paul.

Hubert H. Humphrey, III, Atty. Gen., Craig R. Anderson, Mary Jo Murral, Sp. Assts., St. Paul, for Dept. of Public Services.

Carla C. Kjellberg, Minneapolis, for MN Public Interest Research Group.

WAHL, Justice.

Northern States Power Company (NSP) obtained a writ of certiorari to review an order of the Minnesota Public Utilities Commission (Commission). The Commission's order vacated its earlier findings of fact, conclusions of law and order; dismissed NSP's general rate case; discontinued scheduled interim rates; and required a refund of the excess between the interim rates and the prior effective rates. The matter is before this court upon the granting of NSP's petition for accelerated review, unopposed by the Commission. We affirm in part and reverse in part and remand.

These proceedings began on February 28, 1985 when NSP filed its petition for a general natural gas rate increase of $20,430,000. Pending final determination, interim rates producing an annual increase in revenues of $16,758,200 were authorized effective April 29, 1985 and contested case hearings were ordered. A number of parties intervened and an extensive record was developed during the contested case and public hearings. The administrative law judge (ALJ) ultimately recommended a rate increase approximating $16.8 million on November 8, 1985.

The record discloses that on October 15, 1985, prior to the issuance of the ALJ's findings, conclusions and recommendation, Leo G. Adams, then a Public Utilities Commissioner whose term was to expire in January 1986, commenced a series of contacts with officials of NSP about the possibility of future employment. The record well documents that frequency of contact from October 1985 to December 26, 1985 when

Adams accepted an offer of employment by NSP.

On October 30, Adams attended a breakfast meeting with Roy Berglund, Vice President of Commercial Operations and NSP President Bruce Richard, at which they discussed the possible creation of a position with the company. The three met again on December 5, a date which coincided with the Commission's first deliberations after the filing of the ALJ's recommendation; both Adams and Berglund were present at that Commission's session. On December 11 Adams and Berglund again met and on December 17, Adams, Berglund, Richard and Jerry McKinney, NSP's Vice President of Personnel met to discuss Adams' employment as Industrial Relations Administrator. Terms and conditions of employment were discussed at a December 19 meeting and an offer was extended on December 20 whereby Adams would commence work on February 1, 1986 at a salary of $45,900, a salary less than that paid to Adams in his capacity as a Commissioner. All these individuals, by affidavit, have attested that there was no discussion of the pending NSP rate case or its specific issues.

As indicated, the Commission continued to deliberate during the period of these employment negotiations, with sessions on December 5, 6 and 9. The Commission's report discloses Adams' active participation in these proceedings; he voted in favor of NSP in 8 of 10 non-unanimous votes and on three issues decided by a 3–2 vote, his vote was decisive. According to the Commission itself, his decisive vote concerned approximately $780,000 of the total increase sought. The commission reviewed its own proposed order on December 19 in Adams' presence and again on December 24 on Adams' vacation absence. The final order was issued on December 30 approving a rate increase in an annual amount of $17.1 million.

A newspaper article on January 15, 1986 discussing Adams' new employment prompted NSP's request to the Commission to reconsider and reissue its order and the Department of Public Service and other

parties' motion to dismiss the action in its entirety. The Commission, sitting without Adams, essentially concluded that the parties to the employment negotiations had a duty to disclose their contacts, that Adams had a substantial conflict of interest, that NSP benefited from the association with Adams, that public confidence in the Commission's decision was shaken and that the proceedings were irrevocably tainted. By order of February 19, 1986, the Commission vacated its earlier order, dismissed the rate case, discontinued the interim rates and directed a refund with interest of the excess of interim rates over the restored rate. NSP has sought review.

We initially observe that the issues presented on appeal are difficult and troubling, the resolution of which is apt to be of significant interest to the public. This court is called upon to balance decisional and statutory authority against the integrity of the system and the public confidence it must promote.

We must determine whether there is substantial evidence of a conflict of interest or ex parte communication which tainted the proceedings underlying the dispositional order of the Commission and, if so, under the facts presented, whether the Commission is empowered to dismiss the proceeding in its entirety or otherwise correct attendant errors.

1. The Commission decided that the contacts between a member of its body and representatives of a party involved in pending proceedings constituted a conflict of interest and irrevocably tainted the proceedings. A conflict of interest is statutorily defined in a number of contexts: in describing a conflict as it relates to employees of the executive branch, the statute proscribes acceptance of other employment that will affect the employee's independence of judgment in the exercise of official duties, Minn.Stat. § 43A.38, subd. 5(b) (1987); use of the employee's official position to secure advantages different from those available to the general public, Minn. Stat. § 43A.38, subd. 5(a) (1987); employment by a business which is subject to direct or indirect review by the employee,

section 43A.38, subd. 6(c) (1987); use for private advantage of prestige or influence of state office, section 43A.38, subd. 6(a) (1987); or receipt of any promise of future employment or other benefit for any activity related to the duties of the employee, section 43A.38, subd. 2 (1987). Conflict of interest is defined for public officials as that situation requiring a decision that would substantially affect one's financial interests or those of a business with which one is associated, Minn.Stat. § 10A.07, subd. 1 (1987). Finally, a conflict with regard to members of the Public Utilities Commission is defined as a receipt of a significant portion of one's income directly or indirectly from a public utility; failure to divest oneself of any significant interest in a utility; failure to abandon employment with a utility; or participation in any decision of the Commission where one has a direct or indirect financial interest, Minn. Stat. § 216A.035 (1984).

Presumably, by specifically addressing the nature of a conflict as it might arise in proceedings pending before the Department of Public Service and its commission, the legislature has intended that, in the first instance, it is that body which must confront and resolve claimed abuses. Minn.Stat. § 216A.035 (1984). We note that in assuring compliance with its rules and regulations, section 216A.05, subd. 1 (1987), and in promoting the integrity of the process, section 14.60, subd. 2 (1987), the department or its commission is certainly most equipped to determine if such a conflict exists and what impact it might have had on the ultimate disposition.

■ It is our view that there is substantial evidentiary support for the Commission's conclusion that a conflict of interest, real or perceived, existed. *See St. Paul Area Chamber of Commerce v. Minnesota Public Service Commission*, 312 Minn. 250, 251 N.W.2d 350 (1977). It would be difficult to deny that Adam's participation in the decision could likely affect his direct or indirect financial interest in the utility by which he would soon be employed. The legislature has addressed the action necessary once a conflict arises. A written

statement disclosing and identifying the existing or potential conflict must be filed and one must remove oneself from participation in the pending proceeding. *See* Minn.Stat. §§ 10A.07, 216A.035 and 43A.38, subd. 7 (1984). Adams ignored the requisite procedure, apparently unilaterally decided that no conflict existed and continued his active participation in the decisional process.

■ We are equally persuaded that these events could similarly be characterized as a proscribed ex parte communication. While both Adams and representatives of NSP affied that at no time during employment negotiations did the subject of the pending rate decision arise and Adams himself contends that the Commission's deliberations had been finalized prior to the actual employment offer, these statements seem to us to avoid the focal question and instead reflect a disregard of the spirit if not the letter of the controlling legislation and regulations. We disagree with the offered interpretation that the activities could properly be characterized as an error in judgment.

■ In our view, Adams not only should have disclosed the nature and extent of his contacts immediately, he should have also disqualified himself from active participation and the evidence is compelling that continued participation was not only improper but disqualifying. *See Professional Air Traffic Controller Organization v. Federal Labor Relations Authority*, 685 F.2d 547 (D.C.Cir.1982).

That failure to disclose and disqualify must be viewed as irrevocably tainting at least a portion of these proceedings. While the record contains no direct evidence that Adams unduly influenced the decision, his mere presence creates the obvious appearance of impropriety and undermines the public confidence in the system. We are incredulous that these sophisticated governmental and utility officials could have assumed otherwise. We therefore hold that there is substantial evidentiary support for the findings of the Commission that the individuals had a duty to disclose their association, that Adams had a sub-

stantial conflict of interest and that the proceedings were tainted as a result.

2. Having concluded that there is substantial evidentiary support for the determination that a conflict existed, the second inquiry centers upon the remedial authority available to the Commission. The scope of our review is defined by Minn.Stat. § 14.69 (1987), authorizing reversal if the decision is:

(a) In violation of constitutional provisions; or

(b) In excess of the statutory authority or jurisdiction of the agency; or

\*  \*  \*  \*  \*  \*

(e) Unsupported by substantial evidence in view of the entire record as submitted; or

(f) Arbitrary or capricious.

NSP argues not only that the Commission is without authority, direct or implied to dismiss the proceeding, effectively depriving the gas utility of virtually all return on the equity portion of its utility plant investment, but also that the legislature could not have intended to vest in this agency unbridled authority to vitiate all proceedings and thereby impose a penalty upon the utility for any perceived improprieties.

■ NSP's proposed disposition of a remand to the Commission with instructions that it reconsider the matter on the record before it neither confronts nor satisfies the objection that a great part of the perceived impropriety or influence may well have been subtle and may have indelibly infected the cumulative decisional process of other members of the Commission.

■ The question remains as to the scope of the Commission's authority to remedy or mitigate the perceived harm. It chose to vacate its prior order, dismiss the case in its entirety and order refunds. However, as there is no express statutory authority to support dismissal, if such disposition is appropriate, it draws its propriety implicitly from the Commission's inherent authority to discharge its duties.

Minn.Stat. § 216B.25 (1984) provides as follows:

The commission may at any time, on its own motion or upon motion of an interested party, and upon notice to the public utility and after opportunity to be heard, rescind, alter or amend any order fixing rates, tolls, charges or schedules, or any other order made by the commission and may reopen any case following the issue of an order therein, for the taking of further evidence or for any other reason.

Historically, we have been reluctant to find implied statutory authority. *See, Great Northern Railway Co. v. Public Service Commission,* 284 Minn. 217, 220–21, 169 N.W.2d 732, 735 (1969) where we stated that "the commission, being a creature of statute, has only those powers given to it by the legislature" and "any reasonable doubt of the existence of any particular power in the commission should be resolved against the exercise of such power." More recently, in a case factually distinguishable upon the basis that the issue was an agency's authority to enforce its own order, in *Peoples Natural Gas Company v. Minnesota Public Utilities Commission,* 369 N.W.2d 530, 534–35 (Minn.1985), we concluded that the Commission was without the power to order a refund of discriminatory rates even when the utility had violated the Commission's order by not implementing new rates, stating:

While express statutory authority need not be given a cramped reading, any enlargement of express powers by implication must be fairly drawn and fairly evident from the agency objectives and powers expressly given by the legislature. \* \* \* Consequently, we must look at the necessity and logic of the situation.

*Id.* at 534.

It is this line of authority which compels our conclusion that under these recorded circumstances, the Commission exceeded its authority by dismissing the case in its entirety. We are mindful of and sympathetic to the motives of such a decision,

namely, the efforts of the Commission to assist in the restoration of the shaken public confidence. Nevertheless, we are compelled to conclude that a less harsh result than full dismissal is appropriate where the record lends itself to an elimination of disputed elements of the petitioned increase where the vote of the disqualified member of the Commission was determinative. That result satisfies the necessary and logical result standard espoused in *Peoples Natural Gas Co. v. Minnesota Public Utilities Commission,* 369 N.W.2d 530, 534 (Minn.1985).

We are guided to our conclusion by a number of practical and theoretical considerations. First, we recognize that underlying the petition for a rate increase is the utility's entitlement to revenue sufficient to allow it to meet the cost of providing service and to earn a fair and reasonable return upon its investment. Minn.Stat. § 216B.16, subd. 6 (1984). Insufficient rates are otherwise labeled as unjust, unreasonable and confiscatory. *See Bluefield Water Works & Improvement Company v. Public Service Commission,* 262 U.S. 679, 690, 43 S.Ct. 675, 678, 67 L.Ed. 1176 (1923). *See also Hibbing Taconite Company v. Minnesota Public Service Commission,* 302 N.W.2d 5, 10 (Minn. 1980). A dismissal of these rate proceedings in their entirety would raise constitutional questions unnecessary to the disposition of this matter.

Secondly, NSP itself has moved the Commission for reconsideration and redecision, presumably acknowledging the jurisdiction of the agency to correct any error or perceived impropriety. In conjunction with this, it appears critical that none of the parties seem to have challenged the underlying primary increase at a time when the record was developed or to argue herein that the whole of the approximate $17 million annual increase was not supported by documentary evidence.

Finally, we note with approval that federal decisional authority is not inconsistent with our decision. *See, e.g., Hazel–Atlas Glass Company v. Hartford–Empire Company,* 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944); *Root Refining Company v. Universal Oil Products Company,* 169 F.2d 514 (3rd Cir.1948), *cert. denied* 335 U.S. 912, 69 S.Ct. 481, 93 L.Ed. 444 (1949); and *WKAT, Inc. v. Federal Communications Commission,* 296 F.2d 375, 383 (D.C.Cir.1961), *cert. denied* 368 U.S. 841, 82 S.Ct. 63, 7 L.Ed.2d 40 (1961) ("surreptitious efforts to influence an official charged with the duty of deciding contested cases upon an open record in accord with basic principles of our jurisprudence, eat at the very heart of our system of government—due process, fair play, open proceedings, unbiased, uninfluenced decision. He who engages in such efforts in a contest before an administrative agency is fortunate if he loses no more than the matter involved in that proceeding.")

We are mindful of the legislative response to the public notoriety attending these contacts, most notably, 1986 Minn. Laws ch. 409 including the enactment of Minn.Stat. § 216A.036 providing, for the first time, a statutory prohibition against the offer of employment to a commissioner. 1986 Minn.Laws ch. 409 § 4. However, we commend to the legislature for study the issue of what, if any, remedies are available to a Commission upon discovering irregular or improper conduct by its membership.

Upon remand, the Commission shall, after providing the parties with an opportunity to be heard, determine those rate increases about which there is controversy and revise its order fixing rates accordingly. While the record before the ALJ was completed prior to the initiation of employment contacts and may itself be free of either actual or apparent impropriety, we recognize the difficulty facing members of the Commission as they, upon remand, attempt to quantify the nature and extent of any influence and to separate it, in whatever form it may have taken, as an element of the ultimate rate increase. We anticipate that because Adams' vote was decisive as it related to components totalling approximately $780,000 of the total increase, that at least that amount will be excluded from the ultimate rate increase ordered.

Affirmed in part, reversed in part and remanded.