In the Matter of: An **INVESTIGATION OF UNFAIR ELECTION PRACTICES OBJECTIONS, Rosemount Education Association, Burnsville, Minnesota, and Rosemount Federation of Teachers, Apple Valley, Minnesota, and Independent School District No. 196, Rosemount, Minnesota.**

No. C9–89–1420.

Supreme Court of Minnesota.

Oct. 12, 1990.

Roger A. Peterson, Scott A. Highee, Peterson, Engberg & Peterson, Minneapolis, for Rosemount Federation of Teachers.

Hubert H. Humphrey, III, Atty. Gen., Andrea Mitau Kircher, Sp. Asst. Atty. Gen., St. Paul, for Paul Goldberg, Com'r of Mediation Services.

Eric R. Miller, Donald W. Selzer, Byron T. Jones, Jonathan H. Bloomberg, Oppenheimer, Wolff & Donnelly, St. Paul, for Rosemount Educ. Ass'n.

Richard Thomas, Independent School Dist. No. 196, Rosemount, for Independent School Dist. 196.

SIMONETT, Justice.

This appeal questions the validity of an election conducted by the Bureau of Mediation Services to decide which of two organizations would represent the teachers of the school district. The Commissioner invalidated the election results because of deficient voting instructions. His decision was reversed by the court of appeals. We now reverse the court of appeals.

In April 1989 the teachers of the Rosemount school district voted on who should be their exclusive bargaining representative: the incumbent Rosemount Federation of Teachers (the Federation) or the challenger, Rosemount Education Association (the Education Association).

The election was by mail ballot in accordance with procedures set out in the Bureau's election order posted in the schools and pursuant to the provisions of the Public Employment Labor Relations Act (PELRA). The order stated ballots would be mailed on April 4, 1989, to eligible voters at their home address, together with a stamped self-addressed return envelope. The order instructed that ballots were to be returned to the Bureau by mail and received by the Bureau no later than 4:30 p.m. April 20. The Bureau mailed out 1,125 ballots. The Bureau had an informal practice that voters who did not receive a ballot within a week of the meeting should call in to the Bureau or have someone call in for a replacement ballot. This information was not contained in the posted election order.

Eight hundred seventy-nine ballots were returned. The vote was 440 for the Education Association and 439 for the Federation. The Education Association had won by one vote.

The Federation objected to the election results on various grounds, and several hearings on the objections were held by the Bureau. Ultimately, by order dated August 4, 1989, the Commissioner set aside the election results and ordered a new election. The Commissioner found that "at least fifteen (15) eligible voters may have been affected by either slow mail delivery or lack of adequate instructions in the Bureau's Mail Ballot Election Order." Noting that 245 teachers, about one-fifth of the eligible voters, did not vote, coupled with testimony of witnesses about either not receiving a ballot in the mail or receiving it late, the Commissioner concluded that the Bureau's posted election instructions were seriously inadequate because they did not explain what to do if a ballot was not received.

The Commissioner found there were at least four voters who testified they never received a ballot. Another five testified they received a ballot too late to return it by the deadline. The Commissioner found that the lack of instruction on how to obtain and return a ballot was confusing to eligible voters and abridged basic fairness. The Commissioner stressed that here, where the election was decided by a one-vote margin, the number of teachers potentially disenfranchised was large enough to affect the election results.

The court of appeals reversed the Commissioner and reinstated the election results. The court held that a mail ballot election was unauthorized by statute, but

also decided that the Federation had waived any objection to a mail ballot. The court further held the Commissioner's findings invalidating the election lacked substantial evidentiary support and could not stand. *In the Matter of: An Investigation of Unfair Election Practices Objections, Rosemount Education Ass'n, et al.,* 451 N.W.2d 49 (Minn.App.1990). We granted the petition of the Federation and the Commissioner for further review.

### Issue

The dispositive issue, as we see it, is whether the Commissioner's decision to invalidate the election for inadequate voter instructions is sustainable. If sustainable, we need not consider the arguments claiming invalidity because the voting was not on-site. The dispositive issue has two parts: (1) Did the Commissioner have the statutory authority to invalidate elections for his own derelictions, and (2) if so, is there substantial evidence to support the Commissioner's findings of inadequate instructions unfairly affecting the election results?

### I.

 Relying on Minn.Stat. § 179A.12, subd. 11 (1989),[1] the court of appeals ruled that "the only power [of the commissioner] to void an election occurs if an employer, candidate or employee commits an unfair labor practice which affects the result of an election." 451 N.W.2d at 53.

While the only statutory reference in PELRA to the Commissioner's power to invalidate an election occurs in reference to unfair labor practices by a party (footnote 1, *supra*), we do not think this reference was intended to say, nor does it say, that the Commissioner may not invalidate an election for procedural irregularities attributable to the Bureau. If the Commissioner can set aside an election for misconduct of a party to the election, it would seem the Commissioner should in like fashion be able to remedy his own mistakes. *Cf. Anchor Casualty Co. v. Bongards Co-op Creamery Ass'n,* 253 Minn. 101, 106, 91 N.W.2d 122, 126 (1958).

The question becomes, then, whether the power to vacate elections may be implied, *i.e.,* whether this implied power may be "fairly drawn and fairly evident from the agency objectives and powers expressly given by the legislature." *Peoples Natural Gas Co. v. Minnesota Public Utilities Comm'n,* 369 N.W.2d 530, 534 (Minn.1985). We must look, as we said in *Peoples,* "at the necessity and logic of the situation." *Id.*

One of the announced purposes of PELRA is to help public employees "choose freely their representatives." To implement this policy the Act assigns to the Commissioner of the Bureau of Mediation Services the powers and duties set out in section 179A.04. Under this section, the Commissioner investigates petitions for "any election or other voting procedures," subd. 1(c); issues "notices, subpoenas, and orders required by law to carry out duties," subd. 3(b); certifies "the final results of any election or other voting procedure," subd. 3(e); adopts "rules regulating * * * the conduct of hearings and elections," subd. 3(f); and, finally, shall "conduct elections," subd. 3(i).

Thus the Commissioner has been given a broad grant of power to regulate and conduct elections. If the Commissioner's voting instructions prove inadequate to assure a fair election truly reflecting the will of

---

1. Minn.Stat. § 179A.12, subd. 11 (1989), provided:

 If the commissioner finds that an unfair labor practice was committed by an employer or representative candidate or an employee or group of employees, and that the unfair labor practice affected the result of an election, the commissioner may void the election result and order a new election.

The 1990 legislature has amended this statute, Act of May 4, 1990, ch. 546, § 6, 1990 Minn. Laws 1508, 1510, to now read:

 If the Commissioner finds that an unfair labor practice was committed * * * and that the unfair labor practice affected the results of an election, *or that procedural or other irregularities in the conduct of the election may have substantially affected its results,* the commissioner may void the election results and order a new election.

the electorate, we think it necessarily and reasonably follows that the Commissioner may take corrective measures. In short, we conclude the Commissioner has the implied power to invalidate a representation election where there is a substantial likelihood that deficiencies in the voting procedure adversely affected the election results.

In construing PELRA, this court, when appropriate, may look for guidance to how the National Labor Relations Act, 29 U.S.C. §§ 151–69 (1988), is administered. *See Minnesota State College Board v. Public Employment Relations Board*, 303 Minn. 453, 459, 228 N.W.2d 551, 555 (1975). We note, therefore, that our conclusion here is consistent with the invalidation of elections by the National Labor Relations Board for assorted procedural irregularities. *See, e.g., B & B Better Baked Foods, Inc.*, 208 N.L.R.B. 493, 85 L.R.R.M. 1092 (1974) (late arrival of NLRB agent); *Flo–Tronic Metal Mfg., Inc.*, 251 N.L.R.B. 1546, 105 L.R.R.M. 1144 (1980) (certain election information not printed in both English and Spanish); and *VIP Limousine, Inc.*, 274 N.L.R.B. 641, 118 L.L.R.M. 1399 (1985) (snowstorm prevented some people from voting).

## II.

■ The next question is whether there is substantial evidence to support the Commissioner's findings that lack of instructions on how to obtain a substitute ballot prejudiced the election results.

There was evidence that at least 15 voters may have been adversely affected. Ten of these voters testified at the hearing. The Commissioner found that six teachers, who it was claimed never received a ballot, did not receive a replacement ballot and did not vote. Nine other teachers did not receive their ballot in the mail but did request and receive replacement ballots. Of these nine, three returned their ballot before the deadline; three sent in their ballot too late; and three never mailed in a ballot.

At least four or more of these 15 teachers testified they did not read the election order. The nine who received replacement ballots had requested them through their Federation officer, who relayed their requests, some tardily, to the Bureau.

The Education Association argues, and the court of appeals agreed, that there is no evidence that any of the nonvoting teachers would have voted if the Bureau had provided instructions on how to get a substitute ballot in the posted election order. There is no direct evidence that any teacher who did not vote or did not timely vote would have cast a ballot if instructions had been provided.

It seems to us this evidence lends itself to at least two different inferences. One might infer, as did the court of appeals, that none of the 12 teachers identified as not voting, even if they had been properly instructed on obtaining a replacement ballot, would have voted. On the other hand, one might infer, as did the Commissioner, that at least some of the 12 (not to mention others of the 245 who did not vote) would have requested replacement ballots promptly and would have timely voted, and that this could have made a difference in the election results.

The Commissioner has conducted hundreds of mail ballot elections and is well aware of the vagaries of the United States Mail, the prevalence of procrastination, and the tendency of some people to wait to be told what to do rather than make inquiries. If voters waiting to be told what to do had read the posted election notice they would have remained unenlightened. If instructions on how to obtain a ballot if none was received in the mail had been in the election order, that important information would have been before the teachers; and even those teachers who did not read the election order might have become informed by talking to those who had read the order. Where only one vote would have changed the election results, it would seem reasonable to infer that the absence of posted instructions was confusing, compromised the fairness of the election, and hampered the voters in exercising their right to "choose freely their representatives."

■ We cannot say that the Commissioner's findings are not supported by substan-

tial evidence.[2] " '[U]nless manifestly unjust, inferences must be accepted even though it may appear that contrary inferences would be better supported * * *.' " *Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 825 (Minn.1977). This, too, is the kind of case where "substantial judicial deference to the fact-finding processes of the administrative agency" is warranted. *Id.*

We conclude, therefore, that the Commissioner's findings of a prejudicially defective voting procedure with respect to obtaining replacement ballots are sustainable and that the Commissioner's decision to invalidate the election must be reinstated.[3]

In view of our disposition of this appeal, we need not reach the other issue extensively argued and briefed by the parties, namely, whether the election was invalid because the statute then in effect only authorized on-site elections and not mail ballot elections.[4]

Reversed.

**2.** Substantial evidence is: " '1) such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; 2) more than a scintilla of evidence; 3) more than "some evidence"; 4) more than "any evidence"; and 5) evidence considered in its entirety.' " *Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 825 (Minn.1977). *See also Crookston Cattle Co. v. Minnesota Dept. of Natural Resources*, 300 N.W.2d 769, 777 (Minn.1980).

**3.** Following the invalidation of the mail ballot election, the Commissioner ordered a second on-site election. This election was held on September 19, 1989 (when, by then, the number of teachers in the unit had increased); only 142 of the eligible voters failed to vote and the Federation won by 17 votes.

**4.** The statute in effect at the time of the election, Minn.Stat. § 179A.12, subd. 7 (1989), provided that elections "shall be held in the premises" or "at a place" determined by the Commissioner. The 1990 legislature amended this statute to now read, "The election must be held on one or more sites where those voting are employed or by mail ballot as determined by the commissioner."