# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 04-3368, 04-3408, and 04-3510

_____

Qwest Corporation, a Colorado    *
corporation, *
                                 *
    Plaintiff-Appellee/    *
    Cross-Appellant,    *
                                 *
  v.    *
                                 *
The Minnesota Public Utilities    *
Commission; R. Marshall Johnson, in    *
his official capacity as a member of the    *
Minnesota Public Utilities Commission;    *
Leroy Koppendrayer, in his official    *
capacity as a member of the Minnesota    *   Appeals from the United States
Public Utilities Commission; Phyllis    *   District Court for the
Reha, in her official capacity as a    *   District of Minnesota.
member of the Minnesota Public    *
Utilities Commission; Gregory Scott,    *
in his official capacity as a member of    *
the Minnesota Public Utilities    *
Commission;    *
                                 *
    Defendants-Appellants/    *
    Cross-Appellees,    *
                                 *
CLEC Coalition; AT&T Communi-    *
cations of the Midwest, Inc.,    *
                                 *
    Intervenors Below-Appellants/    *
    Cross-Appellees.    *

_____

Submitted: September 12, 2005
Filed:   November 1, 2005

_____

Before RILEY, LAY, and FAGG, Circuit Judges.

_____

LAY, Circuit Judge.

Minnesota Public Utilities Commission and Intervenors CLEC Coalition and AT&T Communications of the Midwest, Inc. (collectively, "MPUC" or "Commission") appeal the district court's[1] decision that MPUC lacks the authority under Minnesota law to order Qwest Corporation ("Qwest") to comply with restitution for competitive local exchange carriers that were not parties to unfiled interconnection agreements. Qwest cross-appeals, challenging the decision affirming the Liability Order and Penalty Orders' $25.95 million penalty. We conclude that MPUC lacks the authority to order restitution under Minnesota law. However, we find that MPUC properly ordered the $25.95 million penalty. Therefore, we affirm.

## I.

MPUC issued a liability order and two penalty orders against Qwest for alleged violations of the 1996 Telecommunications Act ("Act"). The Act was intended to create competition between carriers in local telecommunication service markets, which had been traditionally dominated by a single monopoly carrier. Incumbent local exchange carriers ("ILECs"), such as Qwest, own the network infrastructure necessary to provide local telephone service. The Act allows competitive local exchange carriers ("CLECs") to access this infrastructure by entering into agreements with an ILEC. Interconnection agreements ("ICAs") between an ILEC and CLECs

_____

[1]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

must be submitted to the MPUC for approval. 47 U.S.C. § 252(a), (e). The terms of these ICAs must be made available to other CLECs that are not parties to the original agreement. See id. § 252(i). Non-party CLECs can then opt in and incorporate the provisions of the original agreement in their entirety into their own ICAs. 47 C.F.R. § 51.809(a).

On February 14, 2002, the Minnesota Department of Commerce filed a complaint against Qwest alleging that Qwest had formed secret ICAs with CLECs that were not properly submitted to MPUC. The complaint asserted that Qwest's failure to disclose discriminated against other non-party CLECs because these CLECs were not given access to the terms contained in the secret ICAs. On March 12, 2002, the Commission referred the case for contested case proceedings before an administrative law judge ("ALJ").

On November 1, 2002, MPUC issued a liability order adopting the ALJ's findings that Qwest knowingly and intentionally violated §§ 251 and 252 of the Act by failing to file twelve ICAs. The unfiled ICAs included six agreements with Eschelon Telecom, Inc., three with McLeodUSA Telecommunications Service, Inc., and one each with Covad Communications Company, USLink, Inc., and a group of ten smaller CLECs. MPUC found that Qwest "knowingly and intentionally" violated both federal and state law by failing to file the twelve ICAs, thereby creating discriminatory conditions on resale and infringing state anti-discrimination statutes. The MPUC imposed a $25.95 million penalty against Qwest and granted restitutional relief for the injured CLECs based upon its interpretation of state statutes.

Qwest brought suit in district court, challenging the liability order and the penalty order. The district court vacated the order for restitutional relief, holding that MPUC lacked either the express or implied authority under Minnesota law to grant

restitution. However, the district court upheld the $25.95 million penalty, finding that it was valid under Minn. Stat. § 237.462.

Title 47 U.S.C. § 252(e)(6) provides for federal court review of state commission decisions. Our sister circuits have held that federal courts review state commission orders under the Act de novo. Mich. Bell Tel. Co. v. MFS Intelenet of Mich., Inc., 339 F.3d 428, 433 (6th Cir. 2003); S.W. Bell Tel. Co. v. Apple, 309 F.3d 713, 717 (10th Cir. 2002); MCI Telecomm. Corp. v. Bell Atlantic Pa., 271 F.3d 491, 517 (3d Cir. 2001); S.W. Bell Tel. Co. v. Pub. Util. Comm'n, 208 F.3d 475, 482 (5th Cir. 2000); GTE S., Inc. v. Morrison, 199 F.3d 733, 742 (4th Cir. 1999). Here, we adopt that standard. This court has supplemental jurisdiction over state law claims under 28 U.S.C. § 1367. Although the arbitrary and capricious standard applies when reviewing a state commission's findings of fact, Mich. Bell, 339 F.3d at 433; S.W. Bell, 208 F.3d at 482; US West Communications, Inc. v. Hamilton, 224 F.3d 1049, 1052 (9th Cir. 2000), whether an agency acts within its statutory authority is a question of law to be reviewed de novo. In re Qwest's Wholesale Serv. Quality Standards, 702 N.W.2d 246, 259 (Minn. 2005) (hereinafter "Qwest's Wholesale").

**II.**

MPUC asserts that it has statutory authority to order restitution under Minn. Stat. §§ 237.081, 237.461, 237.462, and 237.763. MPUC, "being a creature of statute, has only those powers given to it by the legislature." Peoples Natural Gas Co. v. Minnesota Pub. Util. Comm'n, 369 N.W.2d 530, 534 (Minn. 1985) (internal quotation omitted). MPUC may not impose restitutional remedies absent express or implied statutory authority. A review of the statutory language and applicable Minnesota case law shows that MPUC has neither. Nothing in the statutory language expressly grants MPUC the authority to order restitution. Moreover, Minnesota case law supports the

conclusion that we should not find implied statutory authority to order restitution, absent a clear grant of authority by the legislature.

MPUC argues that it has express authority to order restitutional relief under Minn. Stat. § 237.081, which authorizes MPUC to "make an order respecting [an unreasonable, insufficient, or unjustly discriminatory] . . . act, omission, practice, or service that is just and reasonable" and to "establish just and reasonable rates and prices." Minn. Stat. § 237.081, subd. 4. MPUC also claims the authority to order restitution is encompassed within Minn. Stat. §§ 237.461 and 237.462.[2] Section 237.461 is a competitive enforcement statute that permits MPUC to seek criminal prosecution, recover civil penalties, compel performance, or take "other appropriate action." Minn. Stat. § 237.461, subd. 1. Section 237.462 is also an enforcement statute which states that "[t]he imposition of administrative penalties in accordance with this section is in addition to all other remedies available under statutory or common law. The payment of a penalty does not preclude the use of other enforcement provisions . . . ." Minn. Stat. § 237.462, subd. 9. MPUC asserts that this statutory framework supports a finding that MPUC possesses the express or implied authority to order restitution in this case.

While we agree that these statutes give MPUC broad statutory authority to regulate the telecommunications market in Minnesota, none of them vest MPUC with the express authority to order remedial relief. We therefore agree with the district court that because none of these statutes expressly refer to remedial/restitutional relief,

_____

[2]MPUC also relies upon Minn. Stat. § 237.763, which discusses exemptions for alternative regulation plans but retains MPUC's authority under § 237.081 "to issue appropriate orders." Minn. Stat. § 237.763. Other than referring to § 237.081, this statute gives MPUC no additional support for its assertion of authority and we find it to be inapplicable.

the relevant inquiry is whether MPUC has the implied authority to order restitution. We conclude that no such authority exists.

In Peoples Natural Gas, the Minnesota Supreme Court observed that, "[w]hile express statutory authority need not be given a cramped reading, any enlargement of express powers by implication must be fairly drawn and fairly evident from the agency objectives and powers expressly given by the legislature." 369 N.W.2d at 534. The Minnesota court then held that MPUC lacked the implied authority under Minn. Stat. §§ 216B.03 and 216B.08 to order a public utility to refund revenues collected from its customers in violation of a MPUC order, rejecting MPUC's argument that the Commission's duty to assure rates that are "just and reasonable" vested MPUC with the authority to order a refund. Id. at 534-36.

In holding that MPUC lacked this authority, the Minnesota Supreme Court observed that "[i]t is of some significance that the legislature has not seen fit expressly to grant refund powers to the Commission, although it could have done so and in one instance has at least recognized its use." Id. The court was reluctant to interpret the statute as providing implied authority of this kind because "this is not the kind of agency authority that can or should be implied in the absence of more explicit legislative action. It is not enough that the power to order refunds would be useful to the Commission as an enforcement measure." Id. at 535.

The same holds true in this case. MPUC attempts to distinguish Peoples Natural Gas by asserting that the statutory framework has changed significantly since this decision. However, MPUC claims authority under statutory language that is quite similar to that construed by the Minnesota Supreme Court in Peoples Natural Gas. Given the Minnesota court's reluctance to infer authority to grant refund powers in Peoples Natural Gas, we conclude the power to make orders or set rates that are "just and reasonable" or to take "appropriate" action is not a grant of authority to order

restitution. The Minnesota legislature has had twenty years to respond to Peoples Natural Gas, yet "the legislature has not seen fit expressly to grant [restitution] powers to the Commission." Peoples Natural Gas, 369 N.W.2d at 534.

Moreover, in In re New Ulm Telecom, Inc., 399 N.W.2d 111 (Minn. Ct. App. 1987), a Minnesota Court of Appeals panel applied Peoples Natural Gas to uphold a Commission decision that it lacked the authority under § 237.081, subd. 4, to estop a utility from providing service absent a finding of inadequate service under § 237.16, subd. 5. Id. at 122.[3] The court noted that merely because a statute has "references to the words 'fair,' 'just,' and 'reasonable,' nothing in the statutory scheme suggests that the Commission may act as a court of equity." Id. As discussed above, the same is true in this case. The statutory language is too vague to support a conclusion that MPUC has the implied authority to order restitution.

We are also not convinced by MPUC's argument that In re Minnegasco, 565 N.W.2d 706 (Minn. 1997) and the unpublished In re the Members of MIPA, No. C0-97-606, 1997 WL 793132 (Minn. Ct. App. Dec. 30, 1997) support its assertion that the Commission had implied authority to order restitution in this case. In Minnegasco, the Minnesota Supreme Court held that MPUC had the implied authority under Minn.

---

[3]MPUC and the Intervenors object to the district court's reliance on New Ulm. MPUC attempts to distinguish New Ulm on the grounds that there was a statutory violation in the present case, and therefore an equitable remedy under § 237.081 is appropriate. However, we do not read New Ulm to stand for the proposition that § 237.081 authorizes equitable remedies whenever a statutory violation has occurred. A violation of § 237.16, subd. 5, itself justifies the suspension or revocation of an offending utility's license. Minn. Stat. § 237.16, subd. 5. Therefore, the New Ulm court was merely stating that, absent a violation of § 237.16, subd. 5, preventing a utility from providing service would not be appropriate. In re New Ulm, 399 N.W.2d at 122. The district court correctly read New Ulm to hold that § 237.081 does not grant MPUC the authority to impose equitable remedies.

Stat. chapter 216B to order a recoupment remedy to compensate a utility for losses resulting from an error made by MPUC. Minnegasco, 565 N.W.2d at 713. The Minnesota Court of Appeals relied upon and broadened the scope of Minnegasco in its unpublished MIPA opinion, where it held that MPUC had the implied authority to order refunds under Minn. Stat. § 237.081. MIPA, 1997 WL 793132, at *3.

However, these cases do not support MPUC's position. Minnegasco does not provide MPUC with the broad authority to grant equitable relief. Rather, Minnegasco has a limited holding that MPUC has the implied authority to order a recoupment remedy to correct *its own mistake*. Minnegasco, 565 N.W.2d at 711-13. Furthermore, the court in Minnegasco was interpreting "statutory ambiguity" as to whether a utility could get retroactive relief after a judicial decision striking down a MPUC order. Id. at 711-12. In this case, we have no statutory ambiguity because there is a complete absence of statutory language supporting MPUC's position. "We have no ambiguous language to construe, unless perhaps the ambiguity of silence. Consequently, we must look at the necessity and logic of the situation." Peoples Natural Gas, 369 N.W.2d at 534. As for MIPA, as an unpublished order, it is not controlling.[4] See Minn. Stat. § 80A.08, subd. 3; see also Vlahos v. R&I Constr. of Bloomington, Inc., 676 N.W.2d 672, 676 n.3 (Minn. 2004) (discouraging reliance on unpublished opinions as authority).

Moreover, a recent opinion by the Minnesota Supreme Court clearly supports the conclusion that MPUC lacks the authority it asserts in this case. In Qwest's Wholesale, supra, the court held that MPUC does not have the express or implied authority under Minnesota state law to order self-executing penalties. Qwest's Wholesale, 702 N.W.2d at 262. "Historically, we have been reluctant to find implied

_____

[4]Furthermore, the MIPA decision fails to adequately address how Minnegasco's limited holding can be expanded to assert refund authority.

statutory authority in the context of the MPUC's remedial power. As a general rule, we resolve any doubt about the existence of an agency's authority against the exercise of such authority." Id. at 259 (citations omitted).

In Qwest's Wholesale, like the present case, MPUC relied in part upon its express authority to ensure "just and reasonable rates" under Minn. Stat. § 237.081, subd. 4, and Minnegasco to support its assertion of implied authority. Id. at 260-61. The court rejected these arguments, relying upon Peoples Natural Gas and distinguishing Minnegasco. Specifically, the Minnesota court observed:

> [W]e must look closely at the statutory scheme created by the legislature. Doing so, we see no language from which the authority for the MPUC to impose the self-executing payments can be fairly drawn. *The problem we face is that, if nothing more than a broad grant of authority were needed to show that implied authority could be fairly drawn from the statutory scheme, the implied authority would be present in all cases in which the agency had a broad grant of authority.* We declined to adopt such a sweeping rule in Peoples Natural Gas. In that case, noting that we had "no ambiguous language to construe, unless perhaps the ambiguity of silence," we indicated that "we must look at the necessity and logic of the situation." As in Peoples Natural Gas, we think it significant here that the legislature did not expressly provide for remedial authority with respect to wholesale service quality standards even though it could have done so . . . . We also think it significant that the legislature has expressly provided the MPUC the authority to issue administrative penalties for violation of certain MPUC rules and orders.

Id. at 261 (emphasis added) (internal citations omitted).

The court distinguished Minnegasco on several grounds. Most importantly for our purposes, the statutory language at issue in Qwest's Wholesale was not ambiguous. Rather, it was silent. Therefore, the court found that the statutory framework in Qwest's Wholesale was closer to Peoples Natural Gas than Minnegasco. Id. As discussed above, the same is true here. MPUC asserts authority under statutory language that is not ambiguous, but rather fails to address any power to order restitution or remedial measures at all.[5]

We therefore hold that MPUC lacks the statutory authority to order restitution and the restitutional remedies in the Penalty Orders are invalid.[6]

**III.**

We now turn to Qwest's objections to the $25.95 million penalty imposed by MPUC. Qwest makes three arguments challenging the legality of the $25.95 million penalty: (1) that MPUC violated Minnesota law by failing to follow the requisite statutory factors; (2) that the penalty violated the fair notice doctrine because there was no standard for filing ICAs at the time of the relevant agreements; and (3) that the penalty violates the Excessive Fines Clause. As discussed below, we conclude that each of these arguments must fail.

---

[5]In addition, the court distinguished Minnegasco on the grounds that it involved the correction of an unlawful MPUC order. See Qwest's Wholesale, 702 N.W.2d at 261-62. This supports our conclusion that the holding of Minnegasco is limited to correcting MPUC error and does not sustain MPUC's assertion of implied power to order restitution in this case.

[6]Because we affirm the district court on this issue, we decline to address Qwest's other arguments in opposition to the order for restitution.

-10-

*A. State Statutory Factors*

MPUC has the authority to order monetary penalties for violation of the Act under Minn. Stat. § 237.462. Section 237.462, subd. 2, sets out nine factors that the MPUC must consider in setting the penalty amount: (1) the willfulness or intent of the violation; (2) the gravity of the violation, including the harm to customers or competitors; (3) the history of past violations; (4) the number of violations; (5) the economic benefit gained by the person committing the violation; (6) any corrective action taken or planned by the person committing the violation; (7) the annual revenue and assets of the company committing the violation; (8) the financial ability of the company to pay the penalty; and (9) other factors that justice may require. See Minn. Stat. § 237.462, subd. 2.

Qwest argues that MPUC did not calculate the penalty amount in accordance with these statutory factors. Rather, Qwest's position is that MPUC crafted the large penalty to coerce Qwest to agree to the restitution in return for a suspension of the penalty. Qwest contends that the discussion of the statutory factors in the Penalty Orders is merely an attempt by MPUC to justify the penalty amount after it had already been arbitrarily set.

We agree that the transcripts of MPUC hearings do suggest that MPUC intended the penalty to act in part as an incentive for Qwest to comply with the restitutional remedies. However, this motivation does not necessarily make the penalty improper. Our only concern is whether MPUC properly considered the statutory factors as required by law, and whether MPUC's findings are arbitrary and capricious. If the penalty amount is justified by MPUC's consideration of the statutory factors, we need not delve into any further analysis regarding motivation.

MPUC extensively analyzed the § 237.462 statutory factors in the Penalty Orders. The written orders show a considered analysis of both the facts and the statutory framework. There was sufficient evidence to support the Commission's findings that Qwest willfully violated both federal and state law, thereby impeding fair competition in Minnesota and profiting in the process. The Commission's actions were not arbitrary and capricious. We therefore conclude that the district court correctly held that the MPUC Penalty Order of $25.95 million dollars does not violate state law.

## B. Fair Notice Doctrine

Qwest also argues that the penalty violates the fair notice doctrine. Under the fair notice doctrine, "application of a rule may be successfully challenged if it does not give fair warning that the allegedly violative conduct was prohibited." United States v. Chrysler Corp., 158 F.3d 1350, 1355 (D.C. Cir. 1998). The Act does not expressly define "interconnection agreement," and Qwest claims there was no standard for filing ICAs at the time the agreements at issue were created. Therefore, Qwest argues it did not know which agreements should have been filed under 47 U.S.C. § 252.

This argument fails for several reasons, all pointing to the conclusion that Qwest had ample notice that it was required to file the agreements at issue with MPUC for approval. First, Qwest admits that it had fair notice that the agreements containing favorable rates were subject to the filing requirement, yet it failed to file these agreements with MPUC. Failure to comply with *known* standards does nothing to bolster Qwest's argument that it lacked notice.

As for the filing requirements of which Qwest claims ignorance, there are several sources that provide notice as to the breadth of "interconnection agreements." Section 271(c)(2) has an extensive "competitive checklist" that specifies what ILECs must include in ICAs in order to receive authority to provide interLATA long distance service. See 47 U.S.C. § 271(c)(2). As part of this checklist, § 271(c)(2) references § 251(c), which requires ILECs to provide CLECs with interconnection and unbundled access, "on rates, terms, and conditions that are just, reasonable, and nondiscriminatory, in accordance with . . . section 252 of this title." See 47 U.S.C. § 251(c)(2)-(c)(3). In addition, the Federal Communications Commission has broadly interpreted the Act's filing requirement to include any agreements concerning rates, terms, and conditions an ILEC makes available to other CLECs. See In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, 11 F.C.C.R. 15,499 ¶ 167 (1996).

Moreover, Qwest's own broad definition of "interconnection agreement" in its Statement of Generally Available Terms suggests that Qwest's arguments about the above sources' failure to explicitly define which "business-to-business arrangements" constitute terms of interconnection are without merit. Terms regarding dispute resolution, escalation, on-site support, and quarterly meetings have a commonsense relevance to interconnection and unbundled access. As noted by the United States Supreme Court (albeit in the context of the filed-rate doctrine), "[r]ates . . . do not exist in isolation. They have meaning only when one knows the services to which they are attached." American Tel. & Tel. Co. v. Cent. Office Tel., Inc., 524 U.S. 214, 223 (1998). The same is true here. Qwest had ample knowledge that the above terms were relevant to the value of its services to CLECs and should have been filed with MPUC. Therefore, the fair notice doctrine does not apply.

*C. Excessive Fines Clause*

-13-

Finally, Qwest argues that the penalty violates the Excessive Fines Clause of the Eighth Amendment.  <u>See</u> U.S. Const. amend. VIII, cl. 2.  The Eighth Amendment's prohibition of excessive fines applies to the states through the Due Process Clause of the Fourteenth Amendment.  <u>Cooper Indus., Inc. v. Leatherman Tool Group, Inc.</u>, 532 U.S. 424, 433-34 (2001).  A penalty violates the Excessive Fines Clause if it is "grossly disproportional" to the gravity of the offense.  <u>See</u> <u>United States v. Bajakajian</u>, 524 U.S. 321, 334 (1998).  Two considerations in the "grossly disproportional" analysis are legislative intent and the gravity of the offense relative to the fine.  <u>Id.</u> at 336-37.

The Minnesota legislature empowered MPUC with several ways to penalize ILECs that fail to comply with the reporting requirements.  <u>See, e.g.</u>, Minn. Stat. §§ 237.462, subd. 2; 237.16, subd. 5.  Relevant to our current discussion, under § 237.462 MPUC may impose a penalty of up to $10,000 a day per violation.  Minn. Stat. § 237.462, subd. 2.  MPUC imposed a penalty of $10,000 per day for two of the most egregious violations, and $2,500 per day for the other ten.  These amounts are well within the statutory limits and are consistent with the general statutory scheme.

The penalty amount is also not excessive in light of the gravity of the harm caused by Qwest's failure to file.  Millions of dollars are at stake in ICAs.  Qwest's failure to file these agreements violated both federal and state law.  This failure affected the state regulatory body, the competitive environment in Minnesota, and CLECs that were not parties to these agreements. Therefore, the penalty is not grossly disproportional to the harm caused by Qwest's actions.

Qwest's attempt to frame its infractions as mere "filing offenses" under <u>Bajakajian</u> fails.  In <u>Bajakajian</u>, the offense was solely a failure to report the transportation of money outside the United States, with no relation to other illegal

activities, and the defendant was not a money launderer, drug trafficker, or tax evader, the type of individual the statute was designed to punish. Bajakajian, 524 U.S. at 337-38. Furthermore, the defendant's failure to provide information only affected the United States, and in a relatively minimal way. Id. at 339. In the present case, Qwest's failure to report affected the rights of many CLECs operating in Minnesota, and MPUC ordered the penalty under a statute expressly designed to address the present situation. Given the millions at stake in the telecommunications industry and the legislative decision to punish anti-competitive behavior, the penalty in this case is not in violation of the Excessive Fines Clause.

## IV.

For the foregoing reasons, we affirm the decision of the district court.

_____