# GREAT NORTHERN RAILWAY COMPANY v. PUBLIC SERVICE COMMISSION AND OTHERS.

169 N. W. (2d) 732.

July 25, 1969—No. 41996.

*Anthony Kane, L. E. Torinus, H. V. Rhedin,* and *D. E. Engle,* for relator.

*Douglas M. Head,* Attorney General, and *Norton M. Hatlie,* Special Assistant Attorney General, for respondents.

KNUTSON, CHIEF JUSTICE.

This is a writ of prohibition.

The Great Northern Railway Company has for many years operated trains between Minneapolis-St. Paul and Duluth, Min-

nesota, providing both freight and passenger service. The route of these trains runs in part through the State of Wisconsin and provides service to the city of Superior in that state. On May 1, 1969, the Great Northern suspended passenger train operations between Superior, Wisconsin, and Duluth, Minnesota, and substituted chartered bus service operating on the same schedule as the trains between the two cities. Thus, a person traveling on the train from St. Paul to Duluth would disembark at Superior and be transported by bus from Superior to Duluth. Similarly, a person traveling from Duluth to St. Paul would purchase a ticket at the bus station in Duluth and be transported by bus to Superior, where he would board the train. The distance between the railroad stations in Superior and Duluth is approximately 4 miles. No purely intrastate passenger train service has been or is provided by Great Northern between Duluth and any point in Minnesota. An affidavit by a Great Northern official indicates that by discontinuing train service between Superior and Duluth the saving in reduced wages and operating costs, including depot and track rentals, bridge tolls and other charges, is approximately $225,000 per year.

For the purpose of clarity the Minnesota Public Service Commission will be referred to in this opinion as the Commission and the Interstate Commerce Commission will be referred to as the ICC.

On May 2, 1969, on its own motion, the Commission entered an order requiring the railroad to show cause why passenger train service between Duluth and Superior should not be continued and ordering the Great Northern to immediately restore such passenger service pending a hearing on its order to show cause.

On May 6, 1969, we issued our writ of prohibition restraining the Commission from further action of any kind or character which would implement its order of May 2 until the further order of this court.

The sole question presented in this proceeding is whether the

Commission has jurisdiction to regulate passenger train service between Duluth, Minnesota, and Superior, Wisconsin.

At the outset it must be conceded that Great Northern in its operation of the train between Minneapolis-St. Paul and Duluth, Minnesota, which runs through Wisconsin and furnishes service to Superior in that state, is engaged in interstate commerce. Hardwick Farmers Elev. Co. v. Chicago, R. I. & P. Ry. Co. 110 Minn. 25, 124 N. W. 819; State ex rel. R. & W. Comm. v. Chicago, St. P. M. & O. Ry. Co. 40 Minn. 267, 41 N. W. 1047, 3 L.R.A. 238.

In the regulation of commerce it seems quite clear that there are areas where the jurisdiction of the ICC is exclusive; other areas where the jurisdiction of the state regulatory body is exclusive; others where regulation may be exercised concurrently and independently by both; and still others where the regulation may be exercised by the states, but only until Congress may see fit to act upon the subject. Hardwick Farmers Elev. Co. v. Chicago, R. I. & P. Ry. Co. *supra;* Ex parte McNiel, 80 U. S. (13 Wall.) 236, 20 L. ed. 624. Under the Transportation Act of 1920, 49 USCA, § 1(18), it seems clear that where there is a complete abandonment of a portion of a line of railroad engaged in interstate commerce the ICC has exclusive jurisdiction over the subject. Prior to 1958, apparently the ICC had no authority over the partial discontinuance of an interstate railroad operation. New Jersey v. New York, S. & W. R. Co. 372 U. S. 1, 83 S. Ct. 614, 9 L. ed. (2d) 541. In that year Congress enacted what is now codified as 49 USCA, § 13a. Subd. 1 of this statute covers the discontinuance of a railway operation between a point in one state and a point in another state; and subd. 2, the discontinuance of an operation wholly within one state. In construing the language of this statutory provision, the Supreme Court of the United States said (372 U. S. 5, 83 S. Ct. 616, 9 L. ed. [2d] 544):

"Any doubt about this construction of the statute is dispelled by an examination of its legislative history. Section 13a was enacted by Congress as part of the Transportation Act of 1958. The legislative history of that Act reveals Congress' concern about

the financial plight of railroads, attributable in part to the losses sustained in operating passenger trains. To discontinue these trains before the enactment of § 13a, the railroads were required in all cases to seek authority from each of the States served. * * * Without concurrence of all the States affected, the railroad might be compelled to continue operations despite serious losses. The Interstate Commerce Commission was able to give only partial relief. It could authorize total abandonment of a line of railroad under § 1(18) of the Act, even if the line was wholly within the boundaries of one State. * * * However the Commission could not permit partial discontinuance of service over a line of railroad, whether the line crossed state boundaries or not. * * * Thus the Commission could not permit discontinuance of passenger operations while the railroad continued to carry freight over the same line."

The court then considered the legislative history of the act and concluded (372 U. S. 8, 83 S. Ct. 618, 9 L. ed. [2d] 546) :

"It is clear to us from this history, as it was to the Commission, that Congress intended to, and did, leave '[j]urisdiction over trains operating wholly within a single State . . . with State regulatory commissions.' "

A reading of § 13a leads us to the conclusion that with respect to a railroad operating from one state into another, even though both terminals are in the same state, the state regulatory body, such as our Commission, has the power to institute a proceeding of this kind if it lies within the powers conferred upon it by the state, and that if it does so the railroad can in a proper proceeding have the case removed to the ICC. Here, no attempt has been made to invoke the jurisdiction of the ICC, and the question then is whether under our statutory scheme the Commission has the power to act at all.

It is elementary that the Commission, being a creature of statute, has only those powers given to it by the legislature. Backus-

Brooks Co. v. N. P. Ry. Co. (8 Cir.) 21 F. (2d) 4, 19, where the court said:

"It is well settled that the powers of a state Commission are special and limited, and they can exercise only such authority as is legally conferred by express provisions of law, or such as is by fair implication and intendment incident to and included in the authority expressly conferred for the purpose of carrying out and accomplishing the objects for which the Commission was created, and that any reasonable doubt of the existence of any particular power in the Commission should be resolved against the exercise of such power."

The powers of our Commission were enacted, or reenacted, by Ex. Sess. L. 1957, c. 10. At that time, as pointed out in New Jersey v. New York, S. & W. R. Co. *supra*, the ICC had no authority to regulate the discontinuance of a part of the operation of a railroad running from one state through another. As now codified, Minn. St. 216A.05, subd. 2, provides in part:

"The commission shall, to the extent prescribed by law:

"(1) Investigate the management of all carriers * * *, the manner in which their businesses are conducted and the adequacies of the services which they are affording to the public, and make all appropriate orders relating to the continuation, termination or modification of all services and facilities with a view to properly promoting the security and convenience of the public."

We take it that it is this provision upon which the Commission relies mainly for authority to proceed as it has here. However, throughout our act the legislature has, wherever definition was necessary, limited the power of the Commission to the regulation of *intrastate* commerce. Section 218.041, which sets out the duties of the Commission, provides in part:

"Subd. 2. The commission shall, upon petition and appropriate proceedings thereunder:

* * * * *

"(6) Direct the discontinuance of any regularly scheduled *intrastate* passenger trains upon a finding after public hearing that the public will not be deprived of reasonably adequate service thereby." (Italics supplied).

Section 218.021 lists certain acts which a common carrier may not perform. Subd. 1(2), for instance, states that it is unlawful for a common carrier—

"[t]o change or discontinue any published rate, charge or classification, minimum weight or rule relating to the same, or operation of any regularly scheduled *intrastate* passenger trains, without approval of the commission." (Italics supplied.)

The only interpretation of the language quoted in these statutory provisions seems to be in an opinion of the attorney general issued in 1950. He was then asked to interpret Minn. St. 216.62 (subsequently repealed by Ex. Sess. L. 1957, c. 10, § 8), which provided that a railroad could not discontinue any "regularly scheduled *intrastate* passenger trains" without permission. (Italics supplied.) The questions raised were whether the railroad and warehouse commission had jurisdiction over the discontinuance where only interstate service was involved and where both interstate and intrastate service was provided. The attorney general concluded (Report Attorney General, 1950, No. 210, pp. 376, 377) that the legislature "did not intend the commission to have jurisdiction over the discontinuance of interstate passenger trains," but that the commission did have jurisdiction over the discontinuance of intrastate service "even though the trains were also engaged in interstate service."

The authorities from foreign states are not of any assistance. A review of the railroad regulation statutes of the various states indicates that Minnesota is unique in its specific reference to *intrastate* passenger trains. Most states which deal with the question of discontinuance at all have far more general provisions. Thus, for instance, the New Jersey law, N. J. Stat. Ann. § 48:2-24, provides:

"No public utility shall discontinue, curtail or abandon *any service* without obtaining permission from the board [of public utility commissioners] after notice. * * * With respect to common carriers the provisions of this paragraph shall apply only to service operated in accordance with base schedules on file with the board * * *." (Italics supplied.)

At least 20 other states have statutes which are equally or even more specific in allowing regulation of interstate passenger service to the extent permitted by Federal law. A discussion of the statutes and the decisions of other states would be of no value here.

The Commission relies upon the following statement taken from State ex rel. R. & W. Comm. v. Chicago, St. P. M. & O. Ry. Co. 40 Minn. 267, 270, 41 N. W. 1047, 1048:

"There might perhaps be distinguished from this case the case of a Minnesota carrier engaged only in carrying between points within this state, but whose route incidentally at some point, and for an inconsiderable distance, should cross the line of the state."

In the first place, this statement is not applicable to the facts in the case before us, because the railroad here does more than run through Wisconsin. It serves the city of Superior in that state; but above and beyond that, the Commission fails to recognize that the case from which this statement was taken held against the position they now advocate, and continued, after the quoted statement, to say (40 Minn. 270, 41 N. W. 1048):

"* * * Whether or not the transportation in such a case might be deemed to be substantially domestic, and not embracing an important element of foreign transit, we do not decide. This is not such a case. This line within Wisconsin, to which this order is applicable, was operated not merely for transportation between points in Minnesota, but was doing the ordinary business of a common carrier within the state of Wisconsin."

This latter statement is directly applicable to the facts before us.

We also said in the same case, which involved the regulation of rates (40 Minn. 268, 41 N. W. 1048):

"* * * These rates are for the continuous carriage of freight over the entire route, including the transit of 148 miles through the state of Wisconsin. The order is as applicable to that part of the line as to that which is within our own state, and can only be sustained upon the theory that the railroad and warehouse commission of the state of Minnesota has authority to determine what charges may be made for the transportation of freight by a common carrier through the state of Wisconsin, provided only that the carrier receives the property within this state, and is to carry it through the foreign state to a destination within our own borders."

The Commission apparently fails to distinguish between the right to regulate transportation within the state of a carrier operating interstate and the power to regulate the interstate commerce itself. Thus, relying on 49 USCA, § 1(17), it contends that it has power to regulate the discontinuance of the interstate part of this commerce. We fail to see that this section has anything to do with the question involved in the present case. We assume the following language is what the Commission relies upon:

"* * * That nothing in this chapter shall impair or affect the right of a state, in the exercise of its police power, to require just and reasonable freight and passenger service for intrastate business, except insofar as such requirement is inconsistent with any lawful order of the Commission made under the provisions of this chapter and except as otherwise provided in this chapter."

Here, again, it is noticeable that Congress is dealing with the right of a state regulatory body to regulate *intrastate* commerce and not the right to regulate *interstate* commerce. As we have pointed out above, prior to 1958 the ICC had no such power. Whatever power a state commission now has must be subject to

§ 13a, and then only when the state itself has given the regulatory body the power to act, which is not true of our state.

It seems quite clear to us that under § 13a the Commission could be given regulatory power to institute a proceeding of this kind subject to the right of the railroad to remove it to the ICC, if the legislature saw fit to do so. The difficulty is that the legislature has not granted the Commission that power and, until it does, the Commission is not in a position to act. In the light of this situation the writ here must be made absolute.

Writ made absolute.

MR. JUSTICE PETERSON took no part in the consideration or decision of this case.