COUNTY OF PINE, Respondent,

and

John J. Scanlan, et al., intervenors, Respondents,

v.

STATE of Minnesota, DEPARTMENT OF NATURAL RESOURCES, et al., Appellants (49338),

and

Ronald M. Christianson, intervenor, Appellant (49406).

Nos. 49338, 49406.

Supreme Court of Minnesota.

May 11, 1979.

Rehearing Denied July 9, 1979.

Warren Spannaus, Atty. Gen., Richard B. Allyn, Sol. Gen., D. Douglas Blanke, Spec. Asst. Atty. Gen., C. Paul Faraci, Deputy Atty. Gen., and A. W. Clapp, III, Spec. Asst. Atty. Gen., St. Paul, for State, Dept. of Natural Resources, et al.

Nemerov & Robbins and Ford M. Robbins, Minneapolis, for Christianson.

Thomas J. Ryan, County Atty., Pine City, for Pine County.

John J. Scanlan, pro se, and Sharon L. Scanlan, for intervenors-respondents.

Samuel H. Morgan, St. Paul, for Olson, et al.

Jeffrey R. Brooke, Minneapolis, for The Sierra Club.

Heard, considered, and decided by the court en banc.

ROGOSHESKE, Justice.

At issue is the constitutionality of the Kettle River Wild and Scenic Rivers Ordinance (Kettle River ordinance), adopted pursuant to the Minnesota Wild and Scenic Rivers Act, Minn.St. 104.31 to 104.40. Minnesota Department of Natural Resources (DNR) and its commissioner, defendants, and Ronald Christianson, intervenor, appeal from a judgment permanently enjoining enforcement of the Kettle River ordinance to the extent that its provisions exceed those of the Pine County shorelands ordinance. We hold that intervenors-respondents John and Sharon Scanlan must exhaust available remedies by applying for a variance before a challenge to the constitutionality of the ordinance as it applies to their property is ripe for review. Furthermore, we hold that the Kettle River ordinance represents a valid exercise of the police power and is fully authorized by the enabling statute, Minn.St. 104.31 to 104.40. Accordingly, we reverse and remand to the district court with instructions to dissolve the permanent injunction against enforcement of the ordinance.

In the late 1960's, the Minnesota Legislature, responding to concern of residents over the deteriorating water quality of Minnesota lakes and streams, passed a shoreland zoning act. The act required counties and municipalities to regulate shoreland development in accordance with minimum standards to be prescribed by the DNR. Minn.St.1969, §§ 105.485 and 394.25, subd. 2. Although the act applied to rivers as well as lakes, the protection provided to rivers was not as extensive. For example, the regulated corridor around lakes extended 1,000 feet back from the water's edge, while it

extended only 300 feet back from the edges of streams. Minn.St.1969, § 105.485, subd. 2.

In 1973, realizing that Minnesota's choicest rivers and their surrounding environments were inadequately protected, the legislature followed the lead of 19 other states and enacted the Minnesota Wild and Scenic Rivers Act, Minn.St. 104.31 to 104.40. Unlike the old shoreland zoning law, this act does not apply to thousands of bodies of water. Instead, the DNR is required to select and study individual rivers for inclusion in the system.[1] Once the DNR has proposed a particular river for designation, it must prepare a management plan for that river. The management plan provides generally for the classification and boundaries of the river area, use of public lands and water in the area, and local land use controls. The proposed plan is then made available to affected local governmental bodies, shoreland owners, conservation and outdoor recreation groups, and the general public; and a public hearing is held. Upon further consideration by various agencies and public officials, the commissioner decides whether to designate the river, or any portion thereof, for inclusion in the wild and scenic rivers system.

On July 30, 1975, the commissioner of natural resources designated the Kettle River in Pine County as the first of the state's wild and scenic rivers and adopted a management plan, designating the portion of the Kettle River in Pine County above Sandstone as "scenic river," and the portion below Sandstone as "wild river." Minn. Reg. NR 2300. These actions followed an extensive series of public meetings and hearings. More than 60 Pine County residents petitioned to have the river included in the wild and scenic rivers system in order to protect the rights of private landowners and to preserve the natural character of the area. The DNR received no comparable petition opposing designation of the Kettle River in Pine County. In addition, 11 local and regional groups and municipalities registered their support of designation of the Kettle River in Pine County, while only the city of Sturgeon Lake and the Willow River Commercial Club expressed opposition.

Minn.St. 104.36, subd. 1, provides in part:

> "Within six months after establishment of a wild, scenic, or recreational river area, each local government containing any portion thereof shall adopt or amend its local ordinances and land use district maps to the extent necessary to comply with the standards and criteria of the commissioner and the management plan."

Despite this mandate, the board of commissioners of Pine County refused to adopt a wild and scenic river ordinance for the Kettle River. Section 104.36, subd. 1, further provides:

> "* * * If a local government fails to adopt adequate ordinances, maps, or amendments thereto within six months, the commissioner shall adopt such ordinances, maps, or amendments in the manner and with the effect specified in section 105.485, subdivisions 4 and 5."

When, 18 months after designation of the Kettle as a wild and scenic river, no ordinance had been adopted by Pine County, the commissioner of the DNR adopted an ordinance on behalf of the county, as required by the statute. That ordinance is the subject of the instant litigation.

The Kettle River ordinance established land use controls for the preservation and protection of the Kettle River and adjacent land, within the Kettle River wild and sce-

1. The framework for the system is a set of "statewide minimum standards and criteria" promulgated by the DNR. They establish underlying land use controls applicable to all rivers in the system, although the statute indicates that the management plan for a particular river may vary these standards somewhat to take account of individual attributes of the river. Minn.St. 104.34, subd. 2. In April 1974, the commissioner promulgated these statewide standards, Minn.Reg. NR 78–81, in accordance with the Minnesota Administrative Procedures Act, Minn.St. 15.0411 to 15.052. The regulations reflect the wide public participation at the hearings. Specifically, the regulatory provisions regarding minimum lot size, building setbacks, lot width, and timber cutting were each modified in response to comments received during the hearing process.

nic land use districts. Those districts, as defined by the management plan, extend an average distance of 1,213 feet from the high-water mark of the river. The ordinance identifies permitted uses, nonpermitted uses, and conditional uses for lands within each of the two districts. It allows prior nonconforming uses to continue. In addition, the ordinance establishes minimum lot sizes and minimum lot width requirements at the shoreline and at the building line, requires new buildings to be set back certain distances from the normal high-water mark and from the bluff line, and regulates the cutting of timber and vegetation.[2] The ordinance also prescribes setback requirements for septic tanks, regulates grading and filling, and authorizes cluster developments. It permits Pine County to grant a variance from any provision where strict enforcement of that provision of the ordinance would cause unnecessary hardship. Variances are subject to approval by the commissioner of the DNR.

On May 24, 1977, this action for an injunction was commenced by Pine County. On that same date, the county obtained a district court order temporarily restraining the DNR from filing an affidavit of publication of the ordinance, the final step in enactment. See, Minn.St. 375.51. The county argued that the DNR had not followed proper procedures in adopting the ordinance.

By order of June 28, 1977, the district court permitted the Scanlans, owners of land within the wild river district, to intervene as plaintiffs. Intervenors own 40 acres of land near the Kettle River in Pine County, most of which is within the wild river land use district. It appears that the Scanlans' land does not abut the river. The Scanlan property nearest the river consists of a 300- to 400-foot wide strip on the flood plain running parallel to the river. Behind this area is a steep bluff. Atop this bluff, some 16 feet from the edge, the Scanlans have built a concrete block basement which they plan to use as the foundation for their home. An A-frame wooden cabin and a large mobile home are situated near the bluff. Also on the site are two railroad boxcars and several vehicles in various states of repair.

On June 16, 30, and September 23, 1977, the district court heard the testimony of five witnesses on the motion of the county for a temporary injunction, On the basis of that testimony, the district court on December 30, 1977, dissolved its prior order re-

2. The requirements of the existing Pine County shoreland ordinance are shown for comparison:

| | Pine County Shoreland Ordinance | Kettle River Ordinance, Wild River District | Kettle River Ordinance, Scenic River District |
|---|---|---|---|
| Adjacent lands affected | 300 feet from high water mark | 1,320 feet from high water mark, but no more than 320 acres per river mile on both sides of river. On the Kettle, the average is 1,213 feet | Same as Wild |
| Minimum lot size | 20,000 sq. feet | 6 acres | 4 acres |
| Minimum frontage | 100 feet | 300 feet | 250 feet |
| Building setback from high water mark | 75 feet | 200 feet | 150 feet |
| Building setback from bluff line | 0 feet | 40 feet | 30 feet |
| Selective cutting of timber | Permitted | Permitted | Permitted |
| Clear cutting of timber | Restricted | Prohibited within 200 feet of river and within 40 feet back of bluff line | Prohibited within 150 feet of river and within 40 feet back of bluff line |

straining publication of the Kettle River ordinance on the grounds that the county would suffer no irreparable harm. Simultaneously, it permanently enjoined enforcement of the provisions of the ordinance against private landowners "to the extent such provisions exceed the provisions of the present Shorelands Ordinance of Pine County." The district court concluded the Scanlans would suffer irreparable harm, in that the enforcement of the Kettle River ordinance would constitute an impermissible taking of their property in violation of U.S. Const. Amend. V and Minn.Const. art. 1, § 13. On the motion of defendants, the district court reopened the case on February 21, 1978, and made the previously issued injunction temporary, rather than permanent. The court simultaneously granted the motion of Dr. Ronald M. Christianson, the largest private landowner on the Kettle River in Pine County, to intervene in support of the ordinance, and the matter was set for trial.

The cause was tried March 23 and 24, 1978. On August 28, 1978, the district court again made permanent its injunction against enforcement of the ordinance to the extent that its provisions exceeded those of the Pine County shoreland ordinance. It further held that Dr. Christianson was not entitled to relief. An amended judgment was entered, and notices of appeal were filed by the defendants and by Dr. Christianson. The district court stayed enforcement of its order as to persons other than the Scanlans pending resolution of the appeal. We consolidated the appeals and accelerated their consideration because of the effect of the district court's decision on other Kettle River riparian owners and upon the DNR's implementation of the Wild and Scenic Rivers Act as to other rivers.

We note at the outset that a distinction must be drawn between an attack on the facial constitutionality of a zoning ordinance and an attack on the constitutionality of a zoning ordinance merely as it applies to a particular litigant's property. Compare *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303, 54 A.L.R. 1016 (1926), with *Nectow v. Cambridge*, 277 U.S. 183, 48 S.Ct. 447, 72 L.Ed. 842 (1928); Annotation, 136 A.L.R. 1378, 1384 (1942). If the facial constitutionality of the ordinance is challenged, we will address the constitutional issues raised. If, however, the challenge relates only to the constitutionality of the ordinance, as applied, the aggrieved party must first exhaust available remedies before we will consider the constitutional claims ripe for our review. See, *State Dept. of Nat. Resources v. Olson*, 275 N.W.2d 585 (Minn.1979).

The only claim of the Scanlans which attacks the facial constitutionality of the Kettle River ordinance is whether it exceeds a valid exercise of the police power. The trial court apparently was disturbed by what it thought was a dominant "aesthetic" purpose of the ordinance. Preserving the unique natural and scenic resources of this state does have an aesthetic purpose, but this purpose in no way diminishes the validity of the ordinance. In *Naegele Outdoor Advertising Co. v. Village of Minnetonka*, 281 Minn. 492, 162 N.W.2d 206 (1968), this court held valid a zoning ordinance phasing out billboards although aesthetic considerations were a significant factor motivating enactment of the ordinance, because the ordinance was reasonably related to promoting the general welfare and other traditional zoning objectives. Besides promoting aesthetics, the Kettle River ordinance promotes other valid zoning considerations. For instance, the bluff line setback requirement reflects a concern that construction too near the edge of a bluff may be structurally unsafe and may create a potential for harmful pollution from erosion of the bluff. The minimum lot size requirements will limit the density of new construction, thereby limiting septic tank installation and other adverse environmental factors. Restrictions such as setbacks and minimum lot sizes are common to zoning ordinances generally.

The Kettle River ordinance merely restricts uses of property which would have harmful spillover effects on a major public

resource, the river corridor, and on the property of other landowners near the river. These restrictions operate to the reciprocal advantage of all landowners with property near the river, who will reap the aesthetic and economic benefits of the preservation of the river corridor in its natural state. This court early realized the importance of the police power as a flexible tool to protect the welfare of the citizens of this state:

> " * * * The police power, in its nature indefinable, and quickly responsive, in the interest of common welfare, to changing conditions, authorizes various restrictions upon the use of private property as social and economic changes come. A restriction, which years ago would have been intolerable, and would have been thought an unconstitutional restriction of the owner's use of his property, is accepted now without a thought that it invades a private right."

*State ex rel. Beery v. Houghton,* 164 Minn. 146, 150, 204 N.W. 569, 570, 54 A.L.R. 1012, 1014 (1925), affirmed, 273 U.S. 671, 47 S.Ct. 474, 71 L.Ed. 832 (1927). The Kettle River ordinance represents no radical departure from traditional zoning. It merely reflects the increasing complexity of society and the realization that property must be viewed more interdependently. Taking the Kettle River ordinance as a whole, it clearly represents a valid exercise of the police power.

The Scanlans' taking and equal-protection claims relate only to the constitutionality of the act as applied. Therefore, it is essential that the Scanlans show either irreparable harm or that it would have been futile to seek other than judicial relief before we will address those claims.

In the instant case, the Scanlans offer no evidence that they have present plans to use their property in any way foreclosed by the Kettle River ordinance. They merely allude to various hypothetical ways in which their use of the property may be hindered by the setback and minimum lot size requirements of the ordinance. The ordinance does not prohibit any of the Scanlans' existing uses of the property. Thus, the operation of the ordinance can in no way inflict immediate, irreparable harm on the Scanlans. Neither have the Scanlans shown that their application for a variance would be a futile gesture. See, *N. R. Fairbanks Co. v. City of Blaine,* 308 Minn. 315, 320, 242 N.W.2d 99, 103 (1976). Since the Scanlans have failed to exhaust their remedies by applying for a variance from the ordinance,[3] we decline to address their claims that the ordinance is unconstitutional as applied to their property and reverse the trial court's decision on the taking issue.[4]

We finally consider whether the Kettle River ordinance is authorized by the Wild and Scenic Rivers Act. The district court had no basis for holding that the Wild and Scenic Rivers Act prohibited the commissioner from imposing any zoning ordinance more restrictive than the shorelands regulations. Minn.St. 104.34, subd. 2, specifically permits the commissioner to promulgate minimum standards which need not be limited to matters covered in the

3. As this court has intimated, if strict application of a zoning ordinance to a parcel of land would constitute a taking, the granting of a variance would be mandatory. *Holasek v. Village of Medina,* 303 Minn. 240, 226 N.W.2d 900 (1975).

4. Had we reached this issue, the trial court appears to have erroneously applied the diminution-of-value rule as the test for a taking. We feel compelled to point out the controlling test for this state:

> " * * * To establish 'an unconstitutional taking a landowner must demonstrate that he had been deprived, through governmental action or inaction, of all the reasonable uses of his land.' *Czech v. City of Blaine,* Minn., 253 N.W.2d 272, 274 (1977). Mere diminution in market value is not such a demonstration, when a reasonable use of the land is permitted under the zoning ordinance and currently undertaken by plaintiffs. The result would be similar under the Federal Constitution. See, *Euclid v. Ambler Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926)." (Footnote omitted.)

*Holaway v. City of Pipestone,* 269 N.W.2d 28, 30 (Minn.1978); see, also, *Penn Central Transp. Co. v. N. Y.,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 63 (1978).

shorelands act (Minn.St. 105.485). The district court's conclusion, that "preexisting" uses within the meaning of the Wild and Scenic Rivers Act must be construed to extend to all uses in which the landowners now have a right to engage, is contrary to the ordinary meaning of the term. "Preexisting" uses, under the Wild and Scenic Rivers Act, must be construed such that only preexisting actual uses are "grandfathered in" under the ordinance. Future nonconforming uses will be prohibited, unless a variance is obtained.

Finally, the district court's conclusions, that the ordinance was ultra vires because it included concepts such as the bluff line that were not included in the enabling statute and because it secured the elements of a scenic easement through zoning, are erroneous. As to the first conclusion, enabling legislation cannot possibly cover every detail, or the need for administrative regulation would disappear. As to the district court's conclusion that the DNR was attempting to use zoning so restrictive that it was tantamount to acquiring scenic easements, it must first be noted that the legislature specifically authorized both zoning (Minn.St. 104.36) and the purchase of scenic easements (Minn.St. 104.37) along wild and scenic rivers. An examination of the plat map of the Kettle River wild and scenic river system shows that zoning is by no means being used to the exclusion of scenic easements. Moreover, a comparison of the Kettle River zoning provisions with the provisions of a typical scenic easement demonstrates that they are fundamentally different in their degree of restriction. The zoning ordinance can, at best, guide development, while a scenic easement arrests development in perpetuity.

We hold the district court's decision that the ordinance "bear[s] no demonstrable and reasonable relationship to legislative objectives" unfounded. The Kettle River ordinance contains a reasonable set of regulations, completely within the mandate granted to the DNR by the enabling legislation.

Reversed and remanded to the district court with instructions to dissolve the permanent injunction against enforcement of the ordinance.