**In the Matter of the Denial of Certification of the Variance Granted to Robert W. HUBBARD by the City of Lakeland.**

**Nos. A07–1932, A07–2006.**

Supreme Court of Minnesota.

Feb. 11, 2010.

Lori Swanson, Attorney General, David P. Iverson, Kimberly Middendorf, Assistant Attorneys General, St. Paul, MN, for appellant Commissioner of Natural Resources.

Andrew T. Shern, Thomas A. Gilligan, Jr., Murnane Brandt, St. Paul, MN, for appellants Sierra Club and St. Croix River Association.

Sam Hanson, Diane B. Bratvold, Briggs and Morgan, P.A., Minneapolis, MN, Scott R. Strand, David A. Jones, St. Paul, MN, for respondent Robert W. Hubbard.

Nicholas J. Vivian, Eckberg, Lammers, Briggs, Wolff & Vierling, P.L.L.P., Stillwater, MN, for respondent City of Lakeland.

OPINION

GILDEA, Justice.

This action arises from respondent Robert W. Hubbard's application to the City of

Lakeland (City) for a variance in connection with Hubbard's efforts to build a new home on a bluff overlooking the lower St. Croix River. The City granted the variance, but the Department of Natural Resources (DNR) declined to certify[1] the City's action. The DNR upheld its decision through a contested case hearing pursuant to the Administrative Procedure Act, Minn.Stat. ch. 14 (2008). The court of appeals reversed the agency's decision, concluding that the variance was deemed granted by operation of the "60–day rule" of Minn.Stat. § 15.99 (2008). *In re Denial of Certification of Hubbard Variance,* Nos. A07–1932 & A07–2006, 2008 WL 5136099, at *5 (Minn.App. Dec.9, 2008). Because we conclude that the DNR did not have the authority to certify the City's decision to grant the variance, we affirm.

Hubbard purchased property in the City in 2006. The 3.8–acre, heavily forested property has approximately 200 feet of frontage along the St. Croix River and is within an area designated as the Lower St. Croix National Scenic Riverway. The river bluff extends the entire length of Hubbard's property.

Hubbard purchased the property with the intent to build a new, single-family, 10,000–square–foot residence. Hubbard wanted to build the new house right up to the bluff so that the beach would be visible from the house. Under state regulation and City ordinance, however, new construction generally must be at least 40 feet back from the bluffline. City officials accordingly told Hubbard that if he wanted to build the house within 40 feet of the bluffline, he would need a variance from the City's bluffline-setback ordinance.

On July 14, 2006, the City received a request from Hubbard for three variances, including the bluffline-setback variance.[2] The request was assigned first to the Lakeland Planning Commission for its recommendation to the Lakeland City Council. During the planning commission process, the DNR opposed Hubbard's request. Specifically, the DNR argued that the request should be denied because there was adequate space for Hubbard to build the home in compliance with the City ordinance's setback requirements.

On September 6, 2006, the Lakeland Planning Commission held a public hearing on Hubbard's variance request. The DNR reiterated its opposition to the variance request at the hearing. The commission also considered the comments of several neighbors and organizations. Commission members voted to forward the application to the Lakeland City Council with a recommendation that the council deny Hubbard's bluffline-setback variance request on the basis that he had not shown hardship.

The city council then met to consider Hubbard's request. The DNR submitted written comments to the council stating its opposition to the variance request. The council voted to grant Hubbard's variance. At a meeting on October 17, 2006, the council adopted a resolution formally granting the variance request, concluding that Hubbard had met the requirement to show hardship justifying the variance.

1. We use the term "certify" in this opinion to refer to the DNR's claimed power—described in Minn. R. 6105.0540 (2009)—to certify, or refuse to certify, certain local-government land-use decisions.

2. The other two requests related to the setback for the sideyard and height restrictions in the City's ordinances. The City granted these two requests and the DNR has not challenged these decisions. We therefore discuss only the bluffline-setback variance in this opinion.

The City notified the DNR of its variance decision so that the DNR could certify the variance pursuant to DNR rule, Minn. R. 6105.0540 (2009). The rule requires that local units of government notify the DNR Commissioner of any decision to grant a variance from an ordinance applicable to the lower St. Croix, and provides that the local unit's decision is not "effective unless and until the Commissioner has certified that the action complies" with law. Minn. R. 6105.0540, subps. 2, 3. In a letter dated November 29, 2006, the DNR sent the City a "notice of nonapproval" of the bluffline-setback variance. The DNR refused to certify the City's decision because it did not "find adequate justification of the bluffline variance in the City's Findings." According to the notice, "[n]othing in the City's findings addresses the question of why the landowner cannot simply move the house [design] back to meet the 40–foot bluffline setback."

Under Minn. R. 6105.0540, subp. 3(E), the DNR's nonapproval notice "becomes final" unless, within 30 days of the notice, the local authority or the applicant files a demand for a hearing. Both the City and Hubbard demanded a hearing within the 30–day time period. That hearing was held on March 29 and 30, 2007, and on May 8, 2007, the administrative law judge (ALJ) issued a report recommending that the DNR Commissioner affirm the DNR's denial of certification of the bluffline-setback variance. The ALJ concluded that Hubbard had failed to show hardship justifying a variance from the bluffline-setback ordinance.

Hubbard and the City filed exceptions and arguments, which challenged the legal basis of the ALJ's conclusion, and urged the DNR Commissioner to reject the ALJ's recommendation. The City later

contended to the Commissioner that under the 60–day rule of Minn.Stat. § 15.99,[3] its request for certification had been approved by operation of law on August 21. On September 18, 2007, the Commissioner adopted the ALJ's findings of fact with some minor modifications, accepted the ALJ's recommendation, and affirmed the DNR's denial of certification of the bluffline variance. Hubbard and the City appealed the Commissioner's order to the Minnesota Court of Appeals.

The court of appeals, in an unpublished decision, reversed the Commissioner's order. *In re Denial of Certification of Hubbard Variance,* Nos. A07–1932 & A07–2006, 2008 WL 5136099, at *5 (Minn.App. Dec.9, 2008). The court concluded that because the Commissioner "failed to affirm the denial of the variance request on or before August 21, 2007, the request is approved," under the 60–day rule of Minn. Stat. § 15.99, subd. 2(a). Because the court decided the appeal under the 60–day rule, it did not reach three other issues argued by Hubbard and the City.

The DNR Commissioner, the Sierra Club, and the St. Croix River Association petitioned us to review the question of whether the 60–day rule applies to an agency's consideration of an administrative law judge's recommended order in a contested case, rather than the 90 days allowed by the Administrative Procedure Act, Minn.Stat. § 14.62, subd. 2a. (2008). We granted their petitions. After oral argument on June 10, 2009, we ordered additional briefing by the parties on three alternative issues that Hubbard and the City raised. Specifically, Hubbard and the City argued that (1) the DNR lacks statutory authority to certify local variance decisions; (2) the Municipal Planning Act,

---

**3.** Under this statute, the "[f]ailure of an agency to deny a request within 60 days is approv-

al of the request." Minn.Stat. § 15.99, subd. 2(a) (2008).

Minn.Stat. § 462.357 subd. 1e(a) (2008), gives the property owner the right to replace the nonconforming old house on his property without a variance; and (3) the DNR Commissioner did not apply the correct legal standard for granting a variance. We turn first to the question of the DNR's authority to certify the City's variance decision.

## I.

Hubbard contends that the DNR lacked authority to overturn the City's decision on the variance request. Because the agency was without authority to "nullify" the City's decision, Hubbard argues that the City's decision to grant the variance must stand. The Commissioner, Sierra Club, and St. Croix River Association contend that the DNR has both express and implied authority to certify the City's decision.

■■■ Administrative agencies are creatures of statute and they have only those powers given to them by the legislature. *Great N. Ry. Co. v. Pub. Serv. Comm'n,* 284 Minn. 217, 220, 169 N.W.2d 732, 735 (1969); *see also In re Qwest's Wholesale Serv. Quality Standards (Qwest),* 702 N.W.2d 246, 259 (Minn.2005) (noting that "[n]either an agency nor the courts may 'enlarge the agency's powers beyond that

which was contemplated by the legislative body.'" (quoting *Peoples Natural Gas Co. v. Minn. Pub. Utils. Comm'n,* 369 N.W.2d 530, 534 (Minn.1985))). An agency's statutory authority may be either expressly stated in the legislation or implied from the expressed powers. *Peoples Natural Gas,* 369 N.W.2d at 534. Whether an administrative agency has acted within its statutory authority is a question of law that we review de novo.[4] *Qwest,* 702 N.W.2d at 259.

## A.

The Commissioner points to the Minnesota Lower St. Croix Wild and Scenic Rivers Act, Minn.Stat. § 103F.351 (2008), and to the Minnesota Wild and Scenic Rivers Act, Minn.Stat. §§ 103F.301–.345 (2008), as the source of the DNR's authority to certify the City's variance decision. Because the statutes and rule under which the DNR claimed authority to certify the City's variance to Hubbard arise out of the regulatory structure for the lower St. Croix River, we begin with a discussion of this structure, and the specific statutes the Commissioner cites.

In 1968, Congress passed the National Wild and Scenic Rivers Act to protect eight rivers scattered throughout the United States. Wild and Scenic Rivers Act

---

**4.** The Commissioner seemingly contends that because the DNR has construed its statutory authority to include certification, we must defer to the agency's determination of authority. In support of this suggestion of deference, the Commissioner cites *Geo. A. Hormel & Co. v. Asper,* 428 N.W.2d 47, 50 (Minn. 1988), but in that case, we did not have to address the question of whether the legislature had given the agency the authority to take the action (decision on a claim for unemployment compensation benefits) at issue in the case. We have also stated that "[w]hen the agency's construction of its own regulation is at issue ... considerable deference is given to the agency interpretation, especially

when the relevant language is unclear or susceptible to different interpretations." *St. Otto's Home v. Minn. Dep't of Human Servs.,* 437 N.W.2d 35, 40 (Minn.1989) (citing *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Resident v. Noot,* 305 N.W.2d 311, 312 (Minn.1981)). But in these cases, as in *Geo. A. Hormel,* the agency's underlying statutory authority to act was not at issue. In this case, by contrast, we are confronted with the threshold question of whether the legislature has granted an agency the authority to take the action at issue. The DNR's suggestion of deference is therefore misplaced.

(Federal Act), Pub.L. No. 90–542, 82 Stat. 906 (1968) (codified as amended at 16 U.S.C. §§ 1271–87 (2006)). In 1972, Congress added the lower St. Croix River—the portion of the St. Croix River between the dam at Taylors Falls and its confluence with the Mississippi River—to the National Wild and Scenic Rivers system. Lower St. Croix River Act of 1972 (Federal Lower St. Croix Act), Pub.L. No. 92–560, § 2, 86 Stat. 1174 (codified at 16 U.S.C. § 1274(a)(9) (2006)). Congress conditioned the implementation of the Federal Lower St. Croix Act, including an appropriation of federal funds, on Minnesota and Wisconsin developing and executing a master plan for joint state administration of that Act. *Id.*, §§ 3, 6(b), 86 Stat. 1174–75.

In order to comply with the conditions of the Federal Lower St. Croix Act, the Minnesota Legislature enacted the Lower St. Croix Wild and Scenic River Act of 1972 (MLSCA). Act of May 12, 1973, ch. 246, 1973 Minn. Laws 480 (codified as amended at Minn.Stat. § 103F.351 (2008)). The MLSCA directed the Minnesota DNR to join its Wisconsin counterpart and the Secretary of the U.S. Department of the Interior to prepare a master plan for the lower St. Croix River as directed by the Federal Lower St. Croix Act. Minn.Stat. § 103F.351, subd. 2(a). The Commissioner of the DNR, his Wisconsin counterpart, and the federal Secretary of the Interior prepared the master plan as directed. The MLSCA authorizes the DNR to "adopt rules that establish guidelines and specify standards for local zoning ordinances" in the area covered by the master plan. *Id.*, subd. 4(a). The standards "must include" the prohibition of new residential uses inconsistent with the federal and state river acts, and the protection of riverway lands through acreage, frontage, and setback requirements. *Id.*, subd. 4(b)(2). The MLSCA adds that "[c]ities, counties, and towns lying within the areas affected by the guidelines shall adopt zoning ordinances complying with the guidelines and standards within the time schedule prescribed by the Commissioner." *Id.*, subd. 4(c).

During the same legislative session in which it enacted the MLSCA, the Minnesota Legislature also enacted a separate statute relating to wild and scenic rivers. Minnesota Wild and Scenic Rivers Act (MRA), Act of May 16, 1973, ch. 271, 1973 Minn. Laws 521 (codified as amended at Minn.Stat. § 103F.301–.345 (2008)). The MRA is a state analog to, and appears to be modeled on, the Federal Act. Both acts state a purpose of protecting wild and scenic rivers; both set forth criteria for rivers to be included in the respective wild and scenic rivers systems; and both generally identify what protections included rivers will receive. *See* 16 U.S.C. §§ 1271–87; Minn.Stat. §§ 103F.301–.345. Also in the MRA, the DNR is given rulemaking authority and authority to "adopt statewide minimum standards and criteria for the preservation and protection of shorelands within the boundaries of" designated rivers. Minn.Stat. § 103F.321, subd. 2. Finally, the MRA requires that local governments "adopt or amend [their] ordinances" to be in compliance with the DNR standards, and it provides that if the local governments do not do so in a timely manner, the DNR "shall" adopt such ordinances for them. Minn.Stat. § 103F.335, subd. 1(b).

In addition to these statutes, this case also involves rules the DNR adopted for the lower St. Croix River. Minn. R. 6105.0351–.0550 (2009). These rules require local governments, including the City, to adopt ordinances in compliance with the state standards. Minn. R. 6105.0352, subp. 2. The rules also include a process by which local governments must apply to the DNR for certification of a

variance from a lower St. Croix River ordinance. Minn. R. 6105.0540. By refusing to certify a variance the DNR can, in effect, veto a variance related to a lower St. Croix River ordinance that a local government has granted. *See id.*

### B.

With this statutory framework in mind, we turn to the question of the DNR's authority. The Commissioner relies on the MLSCA, Minn.Stat. § 103F.351, and two provisions of the MRA, Minn.Stat. §§ 103F.321 and 103F.335, in arguing that the DNR has authority to certify the City's decision. The three sections provide, in relevant part, as follows.

The [DNR] shall adopt rules that establish guidelines and specify standards for local zoning ordinances applicable to the area within the boundaries covered by the [lower St. Croix River] comprehensive master plan ... [and] in cooperation with appropriate federal authorities and authorities of the state of Wisconsin shall administer state lands and waters in conformance with this section....

MLSCA, Minn.Stat. § 103F.351, subds. 4(a), 5.

The [DNR] shall administer the [Minnesota] wild and scenic rivers system ... and adopt rules to manage and administer the system.

MRA, Minn.Stat. § 103F.321, subd. 1.

[E]ach local government unit with jurisdiction over a portion of the system shall adopt or amend its ordinances ... to the extent necessary to comply with the standards and criteria [described in the MRA].... The [DNR] shall assist local governments in the preparation, implementation, and enforcement of the ordinances.

MRA, Minn.Stat. § 103F.335, subd. 1(a), (c).[5] Based on these three provisions, the Commissioner argues that the DNR has both express and implied authority to certify the City's decision. *See Peoples Natural Gas,* 369 N.W.2d at 534 (noting that an agency's authority may be either express or implied).

### 1.

■ We consider first whether the statutes give the DNR express authority. In determining whether an administrative agency has express statutory authority, we analyze whether the relevant statute unambiguously grants authority for an administrative agency to act in the manner at issue. *See, e.g., Hirsch v. Bartley–Lindsay, Co.,* 537 N.W.2d 480, 485–86 (Minn. 1995). The legislature did not expressly delegate to the DNR the authority to approve local government variance decisions. *Cf. Qwest,* 702 N.W.2d at 260 (concluding that the agency did not have express authority to order "self-executing payments" because "[n]owhere ... does the statutory scheme expressly give [the agency] the power to provide remedies for failures to meet the wholesale service quality standards"). But the Commissioner argues that in both the MLSCA and the MRA, the legislature gave the DNR the express authority to promulgate rules. Because the DNR adopted the certification rule as part of its rulemaking authority, the Commissioner argues that its rule is valid and that the DNR therefore has the authority

---

**5.** The MLSCA, by its terms, applies to the lower St. Croix River and Hubbard's property, and therefore is relevant to the authority question presented here. Hubbard suggested in his brief that the MRA might not apply to the lower St. Croix, but at oral argument Hubbard confirmed that we did not need to reach this issue. We therefore assess the question of the DNR's authority using both the MLSCA and the MRA.

to approve or not approve the City's variance decision.

 Both the MLSCA and the MRA give the DNR broad authority to write rules. MLSCA, Minn.Stat. § 103F.351, subd. 4(a); MRA, Minn.Stat. § 103F.321, subd. 1. But rulemaking authority alone does not answer the express authority question. *See Qwest,* 702 N.W.2d at 260 (concluding that an agency's "broad authority" to "adopt rules as 'necessary to ensure the provision of high-quality telephone services throughout the state,' including 'prescrib[ing] standards for quality of service'" did not also permit the agency to financially penalize a regulated entity that failed to meet those service standards (quoting Minn.Stat. § 237.16, subd. 8(a)(9) (2004))). Moreover, simply because an agency has broad authority to promulgate rules does not mean that the rules the agency promulgates can permissibly expand the substantive authority the legislature gave the agency. *See Hirsch,* 537 N.W.2d at 485, 487 (noting that "[a]n agency has the power to issue binding administrative rules only if, and to the extent, the legislature has authorized it to do so," and concluding that the rule at issue was beyond the scope of the agency's rulemaking authority). To the contrary, as we recognized in *Hirsch,* if the rule purports to expand the authority the legislature gave to the agency, the rule does not fall within the scope of the agency's *express* authority. We reach the same conclusion in this case. Because the statutes at issue do not unambiguously grant authority for the DNR to certify the City's variance decision, we hold that the DNR did not have express authority to do so.

2.

 The fact that the DNR does not have express statutory authority to certify the City's decision does not end our analysis. The Commissioner also argues that the authority to approve the City's variance decision can be implied from the authority the legislature gave to the DNR. We are "reluctant to find implied statutory authority." *In re N. States Power Co.,* 414 N.W.2d 383, 387 (Minn.1987). And, while we need not give an agency's express statutory authority "a cramped reading," any enlargement of powers by implication must be "fairly drawn and fairly evident from the agency's objectives and powers expressly given by the legislature." *Peoples Natural Gas,* 369 N.W.2d at 534. In order to determine whether an administrative agency has implied powers, we look to the "necessity and logic of the situation." *Id.* The question of implied authority therefore requires that we "look closely at the statutory scheme created by the legislature." *Qwest,* 702 N.W.2d at 261.[6]

The Commissioner argues that we may imply authority to certify the City's variance decision from both the MRA and the MLSCA. The stated purpose of the MRA is to "preserve and protect" certain designated Minnesota rivers, and their adjacent lands that possess "outstanding scenic, recreational, natural, historical, scientific and similar values." Minn.Stat. § 103F.305. To effectuate that purpose the legislature conferred powers on the DNR. As noted above, those express powers include the power to classify and designate rivers for protection, Minn.Stat. § 103F.325; the power to set minimum guidelines and standards for local zoning ordinances, by which

---

6. The Commissioner argues that *Peoples Natural Gas* and its progeny, including *Qwest,* do not apply to cases involving agency rule promulgation. But in *Hirsch v. Bartley–Lindsay Co.,* we applied the *Peoples Natural Gas* test to determine an administrative agency's authority to promulgate a rule and held that the agency did not have either express or implied authority to promulgate the rule at issue. 537 N.W.2d at 485–87.

counties and municipalities that abut designated rivers must abide, Minn.Stat. § 103F.321; the power to impose ordinances on counties and municipalities if they fail to adopt their own ordinances in compliance with the DNR minimum guidelines and standards, Minn.Stat. § 103F.335; the power to "adopt rules to manage and administer" the state wild and scenic rivers system, Minn.Stat. § 103F.321; and the power to aid counties and municipalities with passing and enforcing ordinances that comply with the DNR minimum guidelines and standards, Minn. Stat. § 103F.335. Like the MRA, the MLSCA authorizes the DNR to set minimum guidelines and standards for local zoning ordinances, by which local government units abutting the lower St. Croix River must abide. *See* Minn.Stat. § 103F.351, subd. 4. The MLSCA also grants the DNR authority to "administer" the lower St. Croix River in conjunction with Wisconsin and federal officials. *See* Minn.Stat. § 103F.351, subd. 5.

The Commissioner argues that an implied power to certify the City's variance decision is fairly drawn and fairly evident from the purposes of the MRA and the MLSCA, and the DNR's express powers in these statutes, looking to the logic and necessity of the situation. Specifically, the Commissioner argues that the authority to certify is fairly implied from the DNR's broad rulemaking authority in both statutes. The Commissioner relies on *Welsand v. Railroad and Warehouse Commission of Minnesota*, 251 Minn. 504, 88 N.W.2d 834 (1958), to support this rulemaking argument. In *Welsand*, the agency had adopted a rule that required applicants for contract carrier permits to identify their customers, and if the agency found that there were more than 10 customers, the agency required an applicant to show that it was not a common carrier. *Id.* at 506–07, 88 N.W.2d at 836–37.

When the agency found that the appellant was in violation of this rule, the agency cancelled the appellant's permit. *Id.* at 506, 88 N.W.2d at 836. On appeal, the appellant argued that the agency had no authority to promulgate the rule. *Id.* at 508–09, 88 N.W.2d at 837–38.

The agency had "the power to adopt rules necessary for the regulation of contract carriers," but the legislature did not specifically define "contract carriers" other than to provide generally that a "contract carrier" is " 'any person engaged in the business of transporting property for hire over the public highways of this state, other than as a common carrier.' " *Id.* at 509, 88 N.W.2d at 838 (quoting Minn.Stat. § 221.02, subd. 14 (1949)). The agency also had the "power ... to make such rules and regulations ... as may be necessary to the enforcement" of the relevant statutes. *Id.* at 508, 88 N.W.2d at 838 (citation omitted). Within the agency's broad grant of rulemaking and enforcement authority, we implied the authority for the agency to "adopt whatever definitions were reasonably necessary within the area of authorized regulation." *Id.* at 509, 88 N.W.2d at 838.

*Welsand* does not support the implication of authority in this case. First, unlike the agency in *Welsand*, the DNR does not have broad express authority to enforce the relevant statutes. Rather, the legislature has given the DNR the express authority to "assist local governments in the ... enforcement" of ordinances. Minn. Stat. § 103F.335, subd. 1(c). The DNR argues that authority to certify is implicit in this provision. But "assist" means to "give help or support to, especially as a subordinate or supplement." *The American Heritage Dictionary of the English Language* 112 (3d ed.1996). The imposition of a certification rule that operates to overturn local-government variance deci-

sions is at odds with the term "assist" in the statute, especially given that word's connotations of supplementation and subordination. The power to certify therefore is not fairly drawn from the power to assist.

Second, unlike the agency in *Welsand,* the DNR here does not seek to define terms within the area of its designated responsibility. Rather, the DNR seeks to ratify a decision the legislature has delegated to another unit of government. The legislature has given to municipalities, subject to guidelines and restrictions, authority for zoning that encompasses the granting of variances. *See* Minn.Stat. § 462.351 and .357 (2008). In the MRA itself, the legislature specifically vested individual implementation and enforcement of the DNR standards in local governments. *See* Minn.Stat. § 103F.335, subd. 1(c) (noting that DNR is to "assist local governments in the ... enforcement of [their] ordinances"). Construing the DNR's power to promulgate "rules to manage and administer the system" broadly enough to include the authority to certify actions taken by local governments does not give proper deference to the legislature's decision to give local governments the responsibility to enforce standards. *Cf. Hirsch,* 537 N.W.2d at 486–87 (concluding that an agency's promulgation of an exclusive list of reasons for departing from the rules was outside the agency's authority because the legislature placed responsibility for determining "necessity of treatment" not with the agency, but with workers compen-

sation judges); *Guerrero v. Wagner,* 310 Minn. 351, 357, 246 N.W.2d 838, 841 (1976) ("The Commissioner cannot lawfully, by means of an internal departmental rule, circumvent the statute's grant of authority to the compensation judge"). And implying such review authority in the DNR "would introduce a new factor of considerable consequence into the regulatory equation." *Peoples Natural Gas,* 369 N.W.2d at 535. This type of variation should not come from this court, but from the legislature.

██ After all, the legislature has given the express authority at issue here—the authority to certify local government variance decisions—to other statutory entities in other contexts. *See* Minn.Stat. § 103F.373 (2008) (expressly providing authority for the Mississippi Headwaters Board to certify variances granted by counties regulated under the Mississippi headwaters land use plan); Minn.Stat. § 103F.389 (2004) (repealed in part and amended 2005) (expressly providing authority for the Project Riverbend Board to certify variances granted by counties regulated under the Project Riverbend comprehensive plan).[7] The legislature declined to give such express authority to the DNR in any of the statutory sections at issue here even though the legislature knows how to grant such authority if it desires. The inclusion of express authority for certification in these other statutes, combined with the fact that the legislature has never amended the statutory provisions relating

---

**7.** The Commissioner contends that the legislature's decision to grant certification authority to these boards should not inform us here because unlike these boards, the legislature has given the DNR rulemaking authority. The Commissioner also argues that because Minn.Stat. §§ 103F.373 and .389 granted authority to boards rather than administrative agencies, these statutes are inapposite. These distinctions are not material to the question of

the agency's authority. Just like administrative agencies, the boards established in sections 103F.373 and .389 are "creature[s] of statute" having only those powers granted to them by the legislature. *See Great N. Ry. Co. v. Pub. Serv. Comm'n,* 284 Minn. 217, 220, 169 N.W.2d 732, 735 (1969). Powers granted by the legislature, whether to an agency or a board, are limited by the language of the enabling statutes.

to the DNR to expressly include authorization for a certification rule, provides important evidence that the legislature did not intend that the DNR have certification authority. *Peoples Natural Gas,* 369 N.W.2d at 534 (noting that implied authority inquiry "is whether the legislature intended, without saying so, to confer [the] power on the [agency]").

But the Commissioner argues the MLSCA and the MRA must include an implied power for the DNR to approve local government variance decisions. Without such power, the Commissioner asserts that local governments granting unjustified variances with no oversight could in essence undo the guidelines and standards that the DNR sets for river protection, which are supposed to apply uniformly and on a statewide basis. Accordingly, the Commissioner essentially argues that "the necessity and logic of the situation" require that we find implied power for the DNR to certify the City's variance decision. *Peoples Natural Gas,* 369 N.W.2d at 534.[8]

We addressed a similar situation in *Qwest,* and faced with a broader express grant of authority than here, concluded that an agency's express authority to promulgate rules and standards did not necessarily grant it implied authority to enforce those standards as it wanted. 702 N.W.2d at 261. The agency in that case had the express authority to set standards for the quality of wholesale services, and it argued that the remedy at issue was "necessary to enforce the standards." *Id.* at 257. We disagreed, and said that "if nothing more than a broad grant of authority were needed to show that implied authority could be fairly drawn from the statutory scheme, the implied authority would be present in all cases in which the agency had a broad grant of authority." *Id.* at 261. We had rejected such a sweeping rule before and we did so again in *Qwest. Id.; see also Peoples Natural Gas,* 369 N.W.2d at 535 (noting that implied authority does not exist merely because "the power to order refunds would be useful to the Commission as an enforcement measure").

Finally, our decision in *In re Minnegasco,* 565 N.W.2d 706 (Minn.1997), does not support the Commissioner's argument that we should imply authority for the DNR to certify local government variance decisions. In *Minnegasco,* we held that the Public Utilities Commission (PUC) had implied authority to order recoupment to

---

8. In addition, the Commissioner argues that two cases, in particular, support his position: *County of Pine v. State Dep't of Natural Res.,* 280 N.W.2d 625 (Minn.1979), and *Drum v. Minn. Bd. of Water & Soil Res.,* 574 N.W.2d 71 (Minn.App.1998). Neither case, however, supports the Commissioner's arguments.

The Commissioner claims that we indicated in *County of Pine* that the DNR has implied statutory authority for its certification rule. We did not. The issue in *County of Pine* did not involve variances or the certification rule at all. Rather, in *County of Pine,* we addressed the constitutionality of a city ordinance adopted pursuant to an earlier codification of Minn.Stat. § 103F.335 and upheld the ordinance against a challenge that it was unconstitutional. *County of Pine,* 280 N.W.2d at 626–30.

The Commissioner also argues that *Drum* is analogous to the present case and supports his position. We disagree. *Drum,* a court of appeals case, dealt with different circumstances than those presented here. The court in *Drum* was apparently concerned about a gap in the protection of wetlands, between those wetlands the legislature had tasked the DNR to regulate, and those the legislature had tasked the Minnesota Board of Water and Soil Resources to regulate. *See Drum,* 574 N.W.2d at 75. This case does not present any issue of a potential gap in the regulation of the lower St. Croix River. Rather, the legislature made clear that the regulation of the lower St. Croix is to be shared by the DNR and local governments, and made clear what roles each is to play in that regulation.

remedy what we had concluded in an earlier case was the PUC's "exceeding its statutory authority in setting natural gas rates." *Id.* at 708 (citing *Minnegasco v. Minn. Pub. Utils. Comm'n,* 549 N.W.2d 904, 909–10 (Minn.1996)). We reached this result because we found that the PUC's statutory authority was ambiguous on the question of recoupment, and it would be inequitable to deny a remedy to Minnegasco after it successfully challenged the agency's ratemaking. *Id.* at 712–13. Unlike in *Minnegasco,* we are not presented in this case with a situation where an agency's decision has injured a party and that party would be left without a remedy in the absence of implied agency authority to provide a remedy. We also do not have an ambiguous statutory grant of authority that requires our interpretation. *See Qwest,* 702 N.W.2d at 261–62 (distinguishing *Minnegasco* ).

■ In sum, we conclude that the authority to certify the City's variance decision is not "fairly drawn and fairly evident" from the authority the legislature expressly gave to the DNR in either the MRA or the MLSCA. *See Peoples Natural Gas,* 369 N.W.2d at 534. We therefore hold that the DNR does not have implied authority to certify the City's decision.[9]

Because the MRA and the MLSCA do not expressly or impliedly authorize the DNR's certification of the City's decision, the DNR did not have the authority to refuse to approve the variance the City granted to Hubbard, and its nonapproval is void. Our resolution of the authority

9. The Commissioner also argues that the DNR had authority to certify the City's variance decision because the City's ordinance required the DNR's certification. But the City cannot give the agency authority to do something that is beyond the scope of the

issue makes it unnecessary for us to reach the other issues the parties raise.

Affirmed.

MAGNUSON, C.J., and PAGE, J., took no part in the consideration or decision of this case.

legislature's grant of authority to the agency. *See Great N. Ry. Co. v. Pub. Serv. Comm'n,* 284 Minn. at 220, 169 N.W.2d at 735 (noting that agency has only that authority given to it by the legislature).